## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | |
| **UNIVERSAL MARKETING, INC.,** | : | **Chapter 7** |
| | : | |
| Debtor. | : | **Bky. No.  09-15404 ELF** |
| _____ | : | |
| | : | |
| **CHARLES R. GOLDSTEIN,** | : | |
| **Chapter 7 Trustee for the Estate** | : | |
| **of Universal Marketing, Inc.,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **Adv. No. 11-512** |
| **WILMINGTON SAVINGS FUND SOCIETY, FSB,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

# O P I N I O N

I.      INTRODUCTION

II.     FACTS

        A.  General Structure of the Universal Network

        B.  The Formation of the UDI-WSFS Relationship

        C.  The Lending Relationship

            1.  the Business Loan Agreement

            2.  the Note

            3.  the Guaranty

        D.  The Banking Relationship (Cash Management Services Agreement)

E.  The Demise of the UDI-WSFS Relationship

    1.  WSFS' suspicions arise

    2.  WSFS' discovery of and response to the "Red Notice"

    3.  effect of the PND

III.    PROCEDURAL HISTORY

    A.  Main Case

    B.  Adversary Proceeding

IV.    SUMMARY JUDGMENT STANDARD

V.    WSFS IS ENTITLED TO SUMMARY JUDGMENT ON THE TRUSTEE'S CONTRACT CLAIMS (COUNTS ONE AND TWO)

    A.  Threshold Issue: the Relationship between the Loan and the CMA

        1.  contract interpretation

        2.  integration

        3.  the Loan and the CMA each were only partially integrated

    B.  Trustee's Claim for Breach of Express Contract Provisions (COUNT TWO)

        1.  WSFS Non-Performance under the CMA was excused by UDI's material breach of the Loan

        2.  WSFS did not commit a breach of contract by failing to give prior notice before exercising its remedies under the Loan Documents

    C.  Implied Covenant of Good Faith and Fair Dealing (COUNT ONE)

**VI.    WSFS IS ENTITLED TO SUMMARY JUDGMENT ON THE TRUSTEE'S CLAIM UNDER 6 Del. C. §4A (COUNT THREE)**

    **A.   6 Del. C. Article 4A-305**

    **B.   The CMA**

    **C.   Discussion**

**VII.    WSFS IS ENTITLED TO SUMMARY JUDGMENT ON THE TRUSTEE'S FRAUDULENT TRANSFER CLAIMS (COUNTS SIX AND SEVEN)**

    **A.   The Trustee's Claims Are Based Solely on Constructive Fraud**

    **B.   Summary of the Parties' Positions**

    **C.   Constructive Fraud: Applicable Legal Principles**

        **1.   11 U.S.C. §548**

        **2.   11 U.S.C. §544(b) and 6 Del. C. §§1304, 1305**

    **D.   WSFS Was Not an "Initial Transferee" of the UMI Transfers**

        **1.   the Bonded Financial Services and Incomnet Tests**

        **2.   WSFS was not the initial transferee because it lacked dominion and control over the UDI accounts**

    **E.   WSFS Is  Not Liable as a Subsequent Transferee of the UMI-UDI Transfer**

**VIII.    WSFS IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE TRUSTEE'S SETOFF CLAIM UNDER 11 U.S.C. §553(b) (COUNT EIGHT)**

    **A.   The Trustee's §553(b) Claim is Dependent on the Nunc Pro Tunc Extension of Substantive Consolidation to WSFS**

    **B.   Substantive Consolidation: General Legal Principles**

    **C.   Owens Corning Does Not Bar, As a Matter of Law, the Nunc Pro Tunc Extension of Substantive Consolidation to WSFS**

**D.  The Setoff Claim is Not Ripe for Summary Judgment**

**IX.      MANNER OF DISPOSITION OF THE MOTIONS**

**A.  Jurisdictional Overview**

**B.  All of the Claims to be Dismissed are Either Non-Core or <u>Stern</u> Claims**

**C.  The Limited Nature of this Court's Order Resolving the Cross-Motions**

**X.      CONCLUSION**

# I.  INTRODUCTION

In July 2009, Universal Marketing, Inc. ("the Debtor" or "UMI") was one (1) of more than seventy (70) entities in a vertically integrated business ("the Universal Network").  The Universal Network operated approximately thirty-six (36) gas stations in the Northeast and Mid-Atlantic regions of the United States and also distributed gasoline to unaffiliated gas stations.

On July 23, 2009, UMI commenced this chapter 11 bankruptcy case.  UMI was the only Universal Network entity that filed a bankruptcy petition.  The reorganization phase of the case was short-lived; the case was converted to chapter 7 on August 18, 2009.

Eight (8) months after the conversion of the case, on April 19, 2010, Charles R. Goldstein, the chapter 7 trustee ("the Trustee") filed a motion seeking substantive consolidation of UMI's estate with the estates of certain other Universal Network entities, including Universal Delaware, Inc. ("UDI").  Wilmington Savings Fund Society ("WSFS"), a bank that provided both commercial credit and cash management services to UDI, contested the Trustee's motion for

substantive consolidation.

On August 4, 2010, with the consent of all parties, the court entered an order resolving the substantive consolidation issue. The August 4, 2010 Order largely granted the substantive consolidation relief sought by the Trustee. However, the substantive consolidation order excepted WSFS from certain aspects of the Order, in ways to be discussed in more detail below.

*    *    *    *    *    *

In this adversary proceeding, the Trustee seeks to recover money from WSFS based on a variety of claims which may be grouped into three (3) legal categories.

First, the Trustee raises what the parties have referred to as "common law" claims, seeking to impose liability for breach of contract. The Trustee asserts that a "post no debits" policy WSFS implemented as to UDI's bank accounts for a few days in July 2009 breached the UDI-WSFS contract and triggered a "chain-reaction liquidity crisis"[1] throughout the entire Universal Network that "singlehandedly sentenced [the] Universal [Network] . . . to [its] financial death."[2]

Second, based largely on the same events giving rise to his common law claims, the Trustee asserts a statutory claim under 6 Del. C. §4A.

Third, the Trustee asserts traditional bankruptcy transfer avoidance legal theories

---

[1]        (Second Amended Complaint ¶ 87) (Adv. No. 11-512, Doc. # 170).

[2]        (Trustee Memorandum in Support of Motion for Summary Judgment at 1) (Adv. No. 11-512, Doc. # 193) ("Tr. Mem.").

(preference, fraudulent transfers) under 11 U.S.C. §§544, 547, 548, 550, 553(b), analysis of

which is more complex due to the substantive consolidation issues also present in the proceeding.

In response, WSFS maintains that the Trustee's common law claims are based on a gross

exaggeration or mischaracterization of the undisputed facts. WSFS contends, quite simply, that

it did nothing more than exercise ordinary and proper, garden-variety contractual remedies

against UDI after UDI breached its contractual duties to WSFS in various ways (including

fraudulently inducing WSFS to enter into the banking and lending relationship with UDI in the

first place). WSFS also asserts that no avoidable transfers occurred.

*     *     *     *     *     *

Presently before the court are the parties' cross-motions for partial summary judgment on

the issue of liability.

As explained in Part IX.B., infra, all of the claims at issue are either (1) non-core claims,

which require transmission of proposed findings of fact and conclusions of law to the district

court absent consent of the parties, see 28 U.S.C. §157(c)(1), or (2) core claims, for which the

bankruptcy court lacks constitutional authority to enter a final judgment (again, absent consent of

the parties), see Stern v. Marshall, 131 S. Ct. 2594 (2011). In both its Answer to the Second

Amended Complaint and its main brief on summary judgment, WSFS unequivocally declined to

consent to the entry of a final judgment by the bankruptcy court. Cf. Wellness Int'l Network,

Ltd., v. Sharif, 135 S. Ct. 1932 (2015) (parties may consent to entry of judgment by bankruptcy

court). Therefore, I cannot enter a final judgment for either party in this adversary proceeding.

For the reasons stated below, I conclude that WSFS is entitled to summary judgment on

all but one (1) of the Trustee's claims, there being one (1) claim in which there are disputed

issues of material fact, and that the Trustee is not entitled to summary judgment on any of his

claims.  In light of the court's constitutional inability to enter a final order, I will enter an order

that dismisses the Trustee's claims (save one) **for purposes of trial of this adversary**

**proceeding in the bankruptcy court**.  At the conclusion of the proceedings in this court, I will

issue a comprehensive Report and Recommendation to the district court for the entry of an

appropriate order with respect to all claims as to which the bankruptcy court lacks authority to

enter a final judgment.


## II.  FACTS

### A.  General Structure of the Universal Network

The Universal Network was a vertically integrated business involved in the purchase of

gasoline and its resale to both Universal entities and to unrelated, third-party businesses.

Generally, each of the Universal Network gas stations was owned or leased by a single purpose

entity ("SPE").  Within the Universal Network, UMI served as the entity that purchased gasoline

from major oil companies and then resold the gasoline to the SPE's and the unrelated third

parties.  UDI, acted as the management company for UMI and the SPE's.[3]  Daniel Singh (f/k/a

Daminder Batra) ("Singh") was the principal of UDI and many, if not all, of the other Universal

Network entities.

---

[3]      In addition to UDI, other entities in the network included Universal Enterprises, Inc.
("UEI"), Universal Management, Inc., Universal Distribution Inc., and Project Growth Technologies, Inc.

In 2009, UMI and UDI each had separate banking relationships – UMI with TD Bank and UDI with WSFS.  Other Universal Network entities had banking relationships with other institutions, such as Wachovia Bank, Citizens Bank, The Bancorp Bank and PNC Bank, N.A.

The cash needs of the various entities were met by numerous inter-company money transfers, often in the magnitude of hundreds of thousands of dollars on a daily basis.[4]

---

[4]      UMI's corporate secretary described the flow of money within the Universal Network as follows:

> Typically, accounts were structured at a given bank so that each of the SPEs maintained a checking account, into which collections from the corresponding Station would be deposited (the "SPE Accounts").  .   .   . **[A]t the end of each day, the SPE Accounts were "swept" into a "master account" generally in the name of Universal Delaware**. In other words, the SPE Accounts were set up to be "zero balance" . . . accounts.

> *   *   *

> **Cash needs of the Universal Network members were met by funding a given entity whenever it needed funds on hand, from whatever source was available  –  i.e., credit lines, inter-company "loans," or any other source**. Money was constantly flowing to and from the various entities (including [UMI] and Affiliates) in the form of inter-company transfers. **These inter-company transfers were made on a daily basis** between and among [UMI] and the Affiliates, and were effected primarily for the purpose of maintaining liquidity where it was needed in the Universal Network at any given point in time. Moreover, the entities did not maintain formal records of these inter-company transfers--as "loans" or otherwise  –  beyond the bank statements themselves.

> *   *   *

> **The magnitude of the inter-company transfers, on any given day, could amount to hundreds of thousands, and at times, millions, of dollars being shifted among the [UMI's] and the Affiliates' various bank accounts**.

(Declaration of Jashveer Singh; Bky. No. 09-15404, Doc. # 319) (emphasis added). This affidavit was filed in April 2010 in connection with a contested matter in the main bankruptcy case.

By July 2009, the banking relationships that UMI and UDI had with TD Bank and WSFS, respectively, soured.  That month, within a few days of each other, TD Bank locked down UMI's bank accounts and WSFS took similar action against UDI (restricting temporarily, in a manner described in more detail below, outgoing transfers from UDI's accounts).[5]

The dispute before me centers on UDI's and WSFS' lending and cash management relationships.

## B.  The Formation of the UDI-WSFS Relationship

UDI and WSFS first connected in November 2008, when Singh inquired about WSFS' loan and banking services.  (Ex. W-29, WSFS 02026).[6]  Following several meetings between Singh and various WSFS representatives, WSFS made a presentation to Singh for cash management services.  (Ex. W-30, WSFS 02019).  In exchange, Singh provided the "company's financials."  (Id.).  William Foley ("Foley"), WSFS' Vice President and Relationship Manager, considered the financial reports "quite strong."  (Id.).  Singh ultimately requested a $5 million line of credit.

On  January 26, 2009, Foley submitted a Credit Memorandum to WSFS' Senior Loan Committee ("the Credit Memorandum").  (Ex. W-31).  The Credit Memorandum sought approval for a $5 million working capital line of credit to be used for UDI's "general working

---

[5]      The degree to which WSFS restricted transfers out of UDI's accounts is material to the outcome of this adversary proceeding and is discussed in Parts V. and VII., infra.

[6]      When appropriate, citations to the record will include a reference to specific pages using Bate Stamp numbers.

capital needs,"[7] as well as a credit facility and a cash management offering for the prospect of

yielding annual account analysis fees of $134 million.  (Ex. W-31, WSFS 00527).  The terms

included "principal due on demand," a "blanket UCC on all business assets" and an "unlimited

guarantee of Daniel Singh." (Id.).[8]  At that time, WSFS did not require financials for UMI

because UDI was creditworthy, had a strong balance sheet and was profitable.  (Ex. W-28, Foley

2004 Exam. at 56).  Nor did the request involve financing for UMI because WSFS understood

UMI had its own separate banking relationship.  According to Foley, "It was a separate

business."  (Id.).[9]

In March 2009, UDI and WSFS executed several agreements to formalize two (2)

relationships: (1) a lending relationship, designed to provide UDI with working capital for its

business operations; and (2) a banking services relationship, in which WSFS provided a variety

of cash management services to UDI.

---

[7]    Initially, Foley proposed a $4 million demand line on January 8, 2009.  (Ex. W-35, WSFS 06108).  The proposal was revised to $5 million on January 14, 2009.  (Ex. W-36, WSFS 00653).

[8]    The Credit Memorandum explained the origin of UDI, its existence as a business operator of 36 retail gas stations and convenience stores, its relationship as a wholesale purchaser of motor fuel from UEI and the 100% ownership of UDI and UEI by Daniel Singh in both single name ownership and various family trusts.  It also clarified, with respect to UEI, that "[a]lthough financial statements were not provided for this company, D&B reports annual sales of $185MM and profits of $5.0MM in 2006."  (Ex. W-31, WSFS 00528).  This reference to UEI was a clerical error and was meant to refer to UMI.  (Ex. W-28, Foley 2004 Examination at 54).  WSFS corrected the erroneous reference to UEI in a subsequent credit request package made in June 2009, when UDI requested an additional loan of $2.1 million, which WSFS denied.  (Ex. W-40, WSFS 00550).

[9]    Foley further explained: "We were looking at making a loan to Universal Delaware, Inc., which was a retailer of oil fuel.  It didn't matter whether Universal Delaware, Inc. was buying from Universal Marketing, Inc. or some other wholesaler, they would have continued to operated just as successfully."  (Ex. W-28, Foley 2004 Exam. at 56).

## C. The Lending Relationship

On March 19, 2009, UDI and WSFS entered into a line of credit loan transaction ("the

Loan").  The Loan was memorialized by various documents, including a Business Loan

Agreement ("BLA"),  Promissory Note ("the Note"), Security Agreement, Guaranty ("the

Guaranty"), Confession of Judgment, and an Assignment of Leases and Rents.  (See Ex. W-14).

The Note defined these documents collectively as "the Loan Documents."  (Ex. W-14, WSFS

00276, Note ¶ 3 (hanging paragraph)).

## 1.  the Business Loan Agreement

The BLA obligated WSFS to make available to UDI a commercial line of credit in the

principal sum of $5 million.  (Ex. W-14, WSFS 0259, BLA ¶ 1.1).  UDI agreed to repay the Loan

which was evidenced by the Note.  (Id. ¶ 1.2).

The BLA includes several representations that UDI made to induce WSFS to extend the

Loan.  Among those relevant to the pending motions were:

- There were no actions, suits or proceedings pending or threatened which would have a material adverse effect on UDI's ability to perform its obligations under the Loan Documents.  (Id., WSFS 00260, BLA ¶ 3.1(c)).

- UDI disclosed "in writing all facts that could have a material adverse effect on the business or financial condition of [UDI] or any collateral for the Loan."  (Id., WSFS 00261, BLA ¶ 3.1(e)).

- UDI's and Singh's financial statements were true and correct and presented fairly, accurately and completely, the financial position of UDI and Singh.  (Id. ¶ 3.1(f)).

- UDI's assets were held free of other encumbrances and UDI was not obligated to another creditor under a guaranty agreement.  (Id. ¶ 3.1(g)).

- UDI would maintain its primary depository account and cash management

relationship with WSFS for the term of the Loan.  (Id., WSFS 00264, BLA ¶ 4.1(k)).

• all representations and warranties of UDI and Singh (as guarantor) were true in all material respects.  (Id., WSFS 00260, ¶ 2.2(b)).[10]

The BLA enumerated several events of default:

• Any material false or misleading statement, certificate, representation or warranty by UDI to WSFS.  (Id., WSFS 00267, BLA ¶ 5.1(h)).

• Failure to make timely any payment required under the Loan.  (Id., WSFS 00266, BLA ¶ 5.1(a)).

• Any event of default under the Promissory Note or any of the Loan Documents. (Id. ¶ 5.1(b)).

• The prospects of the repayment of the Loan becoming materially jeopardized or impaired in the reasonable judgment of WSFS.  (Id., WSFS 00267, BLA ¶ 5.1(i)).

• UDI's use of the Loan proceeds for something other than the permitted uses.  (Id. ¶ 5.1(l)).

The BLA expressly provided that WSFS "shall have no obligation to provide notice of an Event of Default."  (Id. ¶ 5.1 (hanging paragraph)).

The BLA provided various remedies to WSFS in the event of a default:

• acceleration of the balance of the Loan, without any further demand or notice. (Id. ¶ 5.2(a)).

• increase of the interest rate to an applicable default rate, without notice. (Id. ¶ 5.2(b)).

• any remedy available under applicable law.  (Id., WSFS 00268, BLA ¶ 5.2(c)).

---

[10]    The representations were set forth is several subsections of the BLA.  Some were under the heading "Conditions" (id., WSFS 00529-00260, BLA ¶¶2.1-2.2), some were under the heading "Representations and Warranties" (id., WSFS 00260-00261, BLA ¶¶ 3.1-3.2), and some were under the heading "Covenants," (id., WSFS 00263-00266, ¶¶4.1-4.2).

**2. the Note**

The Note provided for a $5 million  revolving credit facility, with a term commencing on

March 19, 2009, with monthly installments of interest on the principal balance, due on the 19th of

each month.  (Ex. W-14, WSFS 00274-00275, Note Preamble & ¶ 2(b)).  The Note provided for

its term to end upon demand by WSFS, in its discretion, at any time, and yearly extensions of the

facility, the first extension falling on June 30, 2009, just slightly more than three (3) months after

the inception of the Loan.  (Id. ¶ 2(a)).  The Note also required UDI to reduce the principal

balance to zero ($0.00) once per year upon request of WSFS, beginning after June 30, 2009, and

to maintain a zero balance for thirty (30) days before UDI could once again draw down on the

facility.  (Id., WSFS 00276, Note ¶ 2(I)).

Paragraph 6 of the Note specified both monetary and non-monetary Events of Default,

including:

- UDI's failure to make any interest or principal payment when due (id., WSFS 00278, Note ¶ 6(a), (b));

- UDI's failure to maintain its primary deposit account and cash management relationship with WSFS as required by the Loan Agreement (id. ¶ 6(d)); and

- the occurrence of any other default or Event to Default under the Note or the Loan Documents (id. ¶ 6(e)).

Paragraph 7 of the Note provided certain remedies to WSFS in the Event of Default,

including the right to accelerate the Loan without presentation, demand, or protest.  (Id. ¶ 7(a)).

Like the BLA, the Note imposed no obligation on WSFS to provide notice of an Event of

Default.  (Id. ¶ 6 (hanging paragraph)).  UDI expressly waived any notices (including

presentment for payment, dishonor, and protest) under the Note.  (Id., WSFS 00279, Note ¶ 9(a)).

### 3.  the Guaranty

Under the Guaranty, Singh served as an absolute and unconditional guarantor of the Loan.

Upon default, the Guaranty allowed WSFS to proceed against Singh initially and directly without

having to proceed against any other property first.  (Id., WSFS 00303, Guaranty Agreement ¶ 2).

The Guaranty enumerated several events of default, including:

> if any information contained in any financial statement, application, report,
> schedule, report, or other document given by [Singh or UDI] in connection with
> the Loan . . . is not in all material respects true or accurate or if [Singh or UDI]
> omitted to state any material fact or any fact necessary to make such information
> not misleading."

(Id. ¶7(b)).

In the event of default, the Guaranty granted WSFS the right to accelerate the

indebtedness, whether due or not, and required Singh to pay the Loan on demand with

immediately available funds.  (Id. ¶ 7(hanging paragraph)).

### D. The Banking Relationship (Cash Management Services Agreement)

On March 13, 2009, UDI and WSFS entered into a Cash Management Services

Agreement ("the CMA"), which required WSFS to provide certain financial services to UDI.

(See Ex. W-38).[11]  Generally, the relationship provided that WSFS would: maintain multiple

---

[11]     The CMA appears to be a boiler plate type of agreement whereby the borrower checks
off boxes for the desired cash management services it desires from WSFS.  UMI elected seven (7)
services:

> • ACH Debit Block/Filter;
> • Credit & Investment Sweep;
> • Business Internet Banking;
> • Positive Pay;
> • Funds Transfer;

(continued...)

deposit accounts for UDI; utilize automatic clearing houses; sweep funds into a single account on

an automated basis; and permit the transfer of funds in and out of the accounts via use of the

internet.

The CMA consisted of several documents for each of the selected services, including

"riders."[12]  Certain of these documents will be described in more detail in connection with the

---

[11](...continued)
- Xpress Deposit;
- Zero Balance Account.

(Id., WSFS 01533).


[12]     The CMA stated that it was subject to the "General Terms and Conditions Applicable to
Cash Management Services" ("the General Terms and Conditions Attachment") "set forth after the
signatures below" and any terms and conditions set forth in any rider, any exhibit or schedule to a rider,
any addendum or modification that may be executed by the parties.  (Id., WSFS 01533).

        In discovery, WSFS produced a seven (7) page General Terms and Conditions
Attachment.  It provided that either party could terminate its obligations under the CMA on thirty (30)
days notice.  (Id., WSFS 01296, CMA Attachment ¶ 8(a)).  But it also allowed WSFS to terminate the
CMA  immediately with or without prior notice in twelve (12) enumerated situations, including:

- if "any representation made or information provided by a Customer Party is false
  or misleading in any material respect when made or provided," (id. ¶8(a)(viii);

- upon "Customer['s] .  .  .  fail[ure] to comply with any of its obligations under
  these Terms or any one or more Service Agreements," (id. ¶8(a)(I);

- WSFS, in its sole discretion, believing that its provision of any Service created a
  risk of financial loss for it, (id. ¶ 8(b)).

        These provisions are important insofar as the Trustee's claims are based, in part, on the
lack of prior notice before WSFS exercised certain default remedies.

        Significantly, however, the existence and authenticity of the General Terms and
Conditions Attachment is in dispute.  WSFS did not produce the General Terms and Conditions
Attachment until the last day of discovery, alleging that it found the document belatedly on an internal
computer drive.  The Trustee considers these circumstances suspicious and disputes the authenticity of
the document.

        I have not relied on the General Terms and Conditions Attachment in ruling on the
pending motions.

-15-

Trustee's contract claim and his statutory claim under 6 Del. C. §4A.  See Parts V.B. and VI.B.,

infra.

### E.  The Demise of the UDI-WSFS Relationship

### 1.  WSFS' suspicions arise

In May 2009, less than two (2) months after formalizing its relationship with UDI, WSFS

developed concerns about its new customer.  Its suspicions arose after a flurry of Automated

Clearing House ("ACH") activity and a $1 million dollar transfer occurred on May 1, 2009.  (Ex.

W-19, Foley Dep. at 35-38; Ex. W-20, WSFS 02568).  Also, UDI quickly drew down the entire

$5 million credit line, necessitating a conversation between Foley and Singh later that month.

(Ex. W-28, Foley Dep. at 97).  Singh explained the full usage of the line was for capital

expenditures.  (Id.).  This was not an intended use of the line, however, because it was set up for

short-term working capital.  (Id.).

The next month (June 2009), UDI sought to borrow an additional, $2.1 million from

WSFS, increasing the credit line to $7.1 million.  Foley, as UDI's customer representative and

relationship manager, prepared a credit memo to present UDI's new request to WSFS's Loan

Committee.  (See Ex. W-40).  Glenn Kocher, Chair of the Loan Committee and Chief Credit

Officer, was uncomfortable with the request.  (Ex. W-37, Kocher Dep. at 45).  He initially

understood UDI to be a "healthy company," (Id. at 72), but given UDI's misuse of the credit line

at such a rapid pace, he questioned the accuracy of UDI's initial financial statements.[13]  Kocher

---

[13]      Kocher testified that before approving additional credit facilities to UDI, he felt he
needed more information as to how UDI used the existing credit facility.  (Ex. W-37, Kocher Dep. at 45-
(continued...)

deferred the request so that Foley could look beyond UDI's financials to develop a more

complete picture of all of Singh's companies.  (Ex. W-37, Kocher Dep. at 45; Ex. W-28, Foley

Dep. at 105-7).  Accordingly,  in conjunction with its additional borrowing request, UDI

provided to WSFS certain financial documentation, including a 2007 corporate tax return for

UMI and a "review" level financial statement for years-ending December 31, 2006 through

December 31, 2008.  (Ex. W-28, Foley Dep. at 103, 106-7; Ex. W-44, WSFS 00541).

Based on its concerns, WSFS did not act on the request for additional credit.  It also

deferred a decision on extending the existing credit facility under ¶ 2(a) of the Note by pushing

out its internal review date for ninety (90) days, from June 30, 2009 to September 30, 2009.  (Ex.

W-44, WSFS 00541).[14]

---

[13](...continued)
46).  Kocher explained:

> It specifically had to do with the use of our line of credit and the activity of that
> line given the nature of Universal Delaware's business.  Universal Delaware's
> business was portrayed as a retail operation that did not own the real estate, did
> not have much in terms of capital improvements or capital assets, and they
> consumed five million dollars in working capital in a business that is primarily
> cash driven and doesn't have a significant amount of inventory.  That's a lot of
> working capital.  I believe I took the number of stores at some point and divided
> it into our line of credit and determined, hey, they have spent over $100,000 per
> store. How does that happen?  It had everything to do with how is our borrower
> performing?  The financial statements seemed strong, but the use of our credit
> facility did not match what the financial statements were portraying.

(Id. at 48-49).

[14]      In a interoffice memo dated June 26, 2009 from Erin Crozier, a WSFS credit analyst, and
Foley to Steve Clark, Loan Committee Secretary, the extension was deemed a "Minor Modification"
because the line of credit to UDI was a demand, not a term, note.  (Ex. W-19, Foley Dep. at 40-41).  The
explanation for the modification was provided in the "Comments/Reason" section of the memo:

> During the review period (3 months) the line had a high balance of $5.0MM and
> a low balance of $2.0MM.  The line did not meet the requirement of 30

(continued...)

## 2. WSFS' discovery of and response to the "Red Notice"

A dramatic turn of events took place a few weeks later. On the evening of Tuesday, July 14, 2009, WSFS learned that Singh might have another identity. While certain facts are in dispute as to exactly how WSFS became aware of this information, it is clear from the record that WSFS learned that Singh might also be known as "Daminder Batra," an individual wanted for fraud and money laundering in India.[15] (Ex. W-45, Conway Dep. at 15-16). Upon learning of this possibility, WSFS management searched the internet and viewed an INTERPOL[16] web site where Singh's face was posted as a "wanted" person. (Id. at 21). The "INTERPOL Notice" listed the "Categories of Offences" as "Counterfeiting/Forgery Conspiracy, Fraud, Fraud Conspiracy," with the "Arrest Warrant Issued by /India, Allahabad/India, Mumbai/India," and instructed in all capitals and bold typeface: "**IF YOU HAVE ANY INFORMATION**

---

[14](...continued)
> consecutive day rest period as it was just closed in March 2009. It is recommended that it be waived for this review period (3 months) and it will be reviewed again for the next 12 month period starting 6/30/09.
>
> The 90 day extension is requested to allow more time to reevaluate the Borrower's financial statements.

(Ex. W-44, WSFS 00541).

[15]     On July 14, 2009, an Indian-born teller at a WSFS branch recognized Singh as Batra, a man she knew from the local Indian community. (Ex. W-45, Conway Dep. at 15-16). It is not entirely clear whether it was Singh or a member of his family who went into the bank that day, but either way, that visit set in motion the events that resulted in the current litigation.

[16]     INTERPOL is the world's largest police organization comprised of 190 member countries. INTERPOL, http://www.interpol.int/About-INTERPOL/Overview (last visited Nov. 10, 2015).

**CONTACT YOUR NATIONAL OR LOCAL POLICE.**"  (Ex. W-46, WSFS 01523).

Throughout the litigation, the parties have referred to this notice as "the Red Notice."[17]

The next day (Wednesday, July 15, 2009), the Red Notice was brought to the attention of

WSFS' security department.  Foley confirmed to the security department that the face of "Batra"

on the Red Notice was Singh.  (Ex. W-19, Foley Dep. at 42).  That evening, following several

emails and meetings, WSFS management resolved they still needed to authenticate the Red

Notice, but in an abundance of caution, placed a "post no debits" ("PND") restriction on the UDI

accounts, effective the next business day, July 16, 2009.  (Ex. W-2, WSFS 006171).  The PND

was put in place to stop automated debiting and allow WSFS time to review UDI's account and

ensure there were sufficient funds for outgoing transfers.  (Ex. W-7, Brogan Dep. at 78-79, 81-

---

[17]     According to the INTERPOL website,

> INTERPOL Notices are international requests for cooperation or alerts allowing
> police in member countries to share critical crime-related information.

> Notices are published by INTERPOL's General Secretariat at the request of
> National Central Bureaus (NCBs) and authorized entities  .   .   .   .

> **In the case of Red Notices, the persons concerned are wanted by national
> jurisdictions for prosecution or to serve a sentence based on an arrest
> warrant or court decision. INTERPOL's role is to assist the national police
> forces in identifying and locating these persons with a view to their arrest
> and extradition or similar lawful action.**

INTERPOL, http://www.interpol.int/INTERPOL-expertise/Notices (last visited November 10, 2015)
(emphasis added).

        As further explained in the U.S. Attorneys' Manual, a Red Notice "is the closest
instrument to an international arrest warrant in use today."  Office of he United States Attorneys,
http://www.justice.gov/usam/criminal-resource-manual-611-interpol-red-notices (last visited November
10, 2015).

82).[18]

The next morning (Thursday, July 16, 2009), while WSFS continued its investigation, the PND went into effect on a prospective basis. The PND did not prevent transactions already in the system from settling on an automated basis. (Ex. W-7, Brogan Dep. at 78). Consequently, two (2) transfer orders sent to TD Bank (for the benefit of UMI) consisting of six (6) transfers totaling $2,490,150.00 on July 15, 2009 ("the First TD Bank Transfer Order"), and another six (6) transfers totaling $2,689,525.00 on July 16, 2009 ("the Second TD Bank Transfer Order"), settled on July 15 and 16, 2009, respectively. (Ex. W-23, TD 09888-09889, TD 09892; Ex. W-7, Brogan Dep. at 71-72, 75, 78; Ex. W-8, Roberts Report at 21; Ex. W-11). WSFS quickly requested a reversal of the First TD Bank Transfer Order, which was successful. (Exs. Tr.-41,

---

[18]     As WSFS explained in its brief:

> A PND restriction stops automated debiting of an account on uncollected funds, and creates a list of outgoing transfers initiated each day from the depositor's accounts, so the bank can manually ensure that there are collected available funds and stop payment where there are not collected available funds. Otherwise, when a depositor has ACH capabilities, the transfers settle on an automated basis and may be processed by drawing on advance or provisional credit without review.
>
> The PND restriction does not halt activity, as collected money will fund debits. The effect of the PND implemented by WSFS is that, if a depositor (like UDI) is determined to be a high risk customer, the PND stops the funding of outgoing transfers with provisional or advance credit without review, thereby protecting the bank from being an overdraft victim  . . . .

(WSFS Memorandum of Law at 35-36 ("WSFS Mem.") (citing Ex. W-7, Brogan Dep. at 78-82).

42).[19]  TD Bank reversed the transaction and returned the funds to WSFS on July 17, 2009.  (Ex.

W-23, TD 09924).  TD Bank refused WSFS's request to reverse the Second TD Bank Transfer

Order for lack of sufficient funds.  (Ex. W-105, WSFS 00587; Ex. W-8, Roberts Report at 24;

Ex. W-23 at TD 09919-09920).

By the end of day on July 16, 2009, after having spoken to two (2) FBI agents, WSFS

confirmed that the Red Notice was authentic and there was an actual arrest warrant in India for

Singh.  (Ex. W-4, WSFS 03844; Ex.W-50, Kearney Dep. at 14-15 (confirming Red Notice was

on a valid web site); Ex. Tr.-M, Foley Dep. at 91).  WSFS also determined that UDI's primary

operating account was expected to have approximately $5.8 million in it by the close of business

that day.  (Ex. W-4, WSFS 03844).  Accordingly, WSFS decided to transfer $5 million of those

funds and credit them to a general ledger suspense account to insure there were funds available to

pay off the Loan.  (Ex. Tr.-65, WSFS 02456; Ex. W-4, WSFS 03844).

WSFS put a few other precautionary processes in motion that day.  It immediately

implemented: UDI's "line sweep" be turned off, all "money room deposits" be accepted, Foley's

authorization be obtained for cash orders through the "money room vault," and any

communication with Singh should be with Foley.  (Exs. Tr.-66, WSFS 05877; Tr.-67, WSFS

05879; Tr.-69, WSFS 05881; Tr.-70, WSFS 05882).  Essentially, WSFS wanted to assure that all

deposits were accepted and made Foley the point of contact and responsible for determining

---

[19]     The Trustee muddled the summary judgment record by referring to his documentary
exhibits (other than deposition transcripts) by what appears to be the designation given to them at the
various depositions and then lumping numerous exhibits together (not always sequentially) in
attachments to the Motion designated as Exhibits A-Z.  Having burrowed through the filing, I will
continue to use the Trustee's term for referencing the exhibits.

-21-

which debits the bank would permit.

Thursday, July 16, 2009, concluded with Mark Turner, President of WSFS, sending an email (at 8:45 pm) reiterating his message that UDI should be given the benefit of the doubt; that the goal was to protect the bank's interest while treating UDI with respect and the presumption that it was a misunderstanding.  (Ex. W-4, WSFS 03844).  At this point, no one from WSFS had contacted UDI to discuss WSFS' concerns or suspicions about Singh's identity or to explain the internal actions WSFS had taken pertaining to the UDI accounts.  (Ex. W-4, WSFS 03844; Tr.-170).

The next morning (Friday, July 17, 2009), WSFS retained Garvan McDaniel as counsel to handle the UDI matter.  (Ex. W-52, McDaniel Dep. at 21-22).  Thereafter, McDaniel called UDI's attorney, Kevin Ryan, and advised Ryan (or one of his colleagues) about:

> (1) the Red Notice (which he later emailed to Ryan around noon);
>
> (2) Singh's alias;
>
> (3) the PND restriction;
>
> (4) the need for the parties to work together and ensure there were sufficient collected funds in the account before attempting to make withdrawals or outgoing transfers;
>
> (5) WSFS' placement of $5 million on deposit in a suspense account; and
>
> (6) WSFS's right to demand payment of the Loan.

(Ex. W-9, Ryan Dep. at 34-36; 121; Ex. W-52, McDaniel Dep. at 24, 37-39; Ex. W-54, WSFS 000494; Ex. W-55, WSFS 000495).

That afternoon, Ryan asked McDaniel for UDI to have "access to the funds in excess of what [WSFS] needed to offset [the] loan."  (Ex. W-56, WSFS 06756).  The two (2) attorneys

also scheduled a conference call the following Monday morning.  (Ex. W-9, Ryan Dep. at 125).

Meanwhile, the PND restriction remained in place.

On Monday morning (July 20, 2009), McDaniel advised Ryan that WSFS removed the

PND restriction from all accounts, and online banking capabilities for ACH and wire transfers

had been reinstated.  (Ex. W-67, WSFS 000457).  That afternoon, WSFS applied the $5 million

that had been previously moved to the general ledger account on July 16th, to formally repay the

Loan ("the Setoff").  (Ex. W-60, WSFS 00922; Ex. Tr.-L, Foley Dep. at 198).

### 3.  effect of the PND

On July 15 and 16, 2009, while the PND was in effect, UDI received over $11.6 million

dollars in transfers from UMI and UEI  ("the UMI-UDI Transfers").[20]  In turn, between July 15 to

---

[20]     For ease of reference, the term "UMI-UDI Transfers" will include the transfers that UEI
made to UDI in the same time period.  Those transfers were:

> On July 15, 2009:
>
> 1.  $2,840,000.00 from UMI at TD Bank into UDI ("First UMI
>     Transfer");
> 2.  $1,415,775.00 (aggregate sum) from UMI at TD Bank to UDI
>     Account ("Second UMI Transfer");
> 3.  $1,850,000.00 (aggregate sum) from UEI at Bancorp bank ("the First
>     UEI Transfer").

(Trustee's Memorandum of Law in Support of Motion for Summary Judgment at ¶¶ 68-70).

> On July 16, 2009:
>
> 1.  $2,925,000.00 from UMI at TD Bank into UDI ("the Third UMI
>     Transfer");
> 2.  $1,242,050.00 (aggregate sum) from UMI at TD Bank into UDI
>     ("the Fourth UMI Transfer")
> 3.  $1,400,000.00 (consisting of one or more checks) from UEI at
>     Bancorp into UDI  ("Second UEI Transfer").

(Id. at ¶¶ 78-80).

July 22, 2009, UDI transferred over $11 million out of its WSFS accounts to pay a variety of

parties including UMI and UEI ("the Outgoing Transfers").  (Ex. W-8, Roberts Report at 4, 23-

24).[21]  The $11 million in Outgoing Transfers does not include the $5 million transferred to

WSFS to repay the Loan.[22]

On July 23, 2009, three (3) days after WSFS transferred the $5 million to satisfy the

Loan, UMI filed its chapter 11 bankruptcy petition.

# III.  PROCEDURAL HISTORY

## A.  Main Case

As stated above, on July 23, 2009, UMI commenced this chapter 11 bankruptcy case.

The case was converted to chapter 7 on August 18, 2009.  On September 24, 2009, the U.S.

Trustee filed a report giving notice that Goldstein had been elected as chapter 7 trustee.

---

[21]      As explained in WSFS' expert report:

> After WSFS verified that the Debtor Transfers were collected funds and no
> longer subject to return or reversal from the sending banks, WSFS properly made
> the funds available to its customer.  During the time period in question, UDI
> withdrew over $16 million from its WSFS accounts, to pay a variety of parties,
> including UMI and UEI, while $5,000,000 was appropriately applied to repay the
> WSFS demand line.

(Ex. W-8, Roberts Report at 4).


[22]      I recognize that the comparative statistics cited in the text are not perfectly parallel.  The
$11 million in Outgoing Transfers includes two (2) days of transfers after the PND was lifted, but I could
locate nothing in the record that compiled the total of outgoing transfers while the PND was in effect.  In
any event, the Trustee does not dispute that the Outgoing Transfers occurred while the PND was in
effect. (See, e.g., Ex. W-67, McDaniel 000455) (referencing outgoing wire transfers in excess of $3.0
million on July 20, 2009).

On April 19, 2010, the Trustee filed a motion requesting that substantive consolidation of the UMI bankruptcy estate with some, but not all, of the non-debtor Universal Network affiliates ("the Substantive Consolidation Motion").  (Bky. No. 09-15404, Doc. # 316).  UDI was one of the entities to be included in the substantive consolidation.

The Trustee's request was based largely on his view that:

- inter-company transfers "of an incredible magnitude" occurred daily without the maintenance of "formal records;"

- the assets within the Universal Network (largely in the form of cash) "were effectively commingled" that the reconstruction and reconciliation of the accounting records among the separate entities "would be an astronomically expensive, if not impossible, task;" and,

- certain large creditors "appear to have relied upon the overall financial position of the Universal Network as a whole, as opposed to any one of its discreet member entities."

(Memorandum in Support of Trustee's Motion for Substantive Consolidation at 4-5, 13, 17) (Bky. No. 09-15404, Doc. # 317); see generally In re Owens Corning, 419 F.3d 195 (3d Cir. 2005) (controlling case stating legal standards for substantive consolidation).

The Trustee and TD Bank entered into a settlement resolving several issues between them.  Pursuant to that agreement, TD Bank supported the Trustee's request for substantive consolidation.  (Bky. No. 09-15404, Doc. # 366).  On June 8, 2010, WSFS filed a lengthy objection to the Substantive Consolidation Motion.  (Bky. No. 09-15404, Doc. # 364).

The parties reached a global settlement of the Substantive Consolidation Motion and two (2) other pending motions.  That settlement was approved by court order dated August 4, 2010.

(Bky. No. 09-15404, Doc. # 410).[23]

The August 4, 2010 Order provided for the substantive consolidation of the UMI

bankruptcy estate nunc pro tunc with five (5) other Universal entities, including UDI

(collectively, "the Affiliates").[24]

Most relevant to this adversary proceeding, the August 4, 2010 Order included a

significant qualification.  The Order provided that the substantive consolidation of UMI and UDI

would **not** "impact any rights concerning WSFS."  (Id. ¶ 7).  WSFS was excepted from the

effects of the substantive consolidation order.  Instead, as to WSFS, the parties agreed that the

Affiliates, **including UDI**, would be deemed to have filed a bankruptcy as of August 4, 2010 and

that the UDI and UMI estates would be treated as being **jointly administered, not substantively**

**consolidated**.  Significantly, the parties also agreed that the Trustee retained the right to seek to

extend the effect of the substantive consolidation to WSFS nunc pro tunc to the date of UMI's

bankruptcy filing, July 23, 2009, with WSFS reserving all of its rights to challenge the request

for such relief.  (Id. ¶ 7.a.).

---

[23]     Based on the substantive consolidation order and a second substantive consolidation
order, entered at the Trustee's request and without objection, the Trustee auctioned various properties
titled in the name of various Universal entities.  The sale proceeds reduced TD Bank's secured claim
against UMI and the consolidated bankruptcy estate.  Also, on behalf of the estate, the Trustee retained
some of the sale proceeds based on a carve-out agreement with TD Bank.  (See Bky No. 09-15404, Doc.
#'s 488, 529).

[24]     Besides UDI, the Affiliates were the other entities referenced in note 3, supra: UEI,
Universal Management, Inc., Universal Distribution Inc., and Project Growth Technologies, Inc.

## B.  Adversary Proceeding

On July 18, 2011, the Trustee initiated this adversary proceeding by filing a complaint.

(Adv. No. 11-512, Doc. # 1).  On January 13, 2012, the Trustee filed an amended complaint.

(Id., Doc. #'s 30, 35).  WSFS sought dismissal of the initial complaint and, later, the amended

complaint pursuant to Fed. R. Civ. P. 12(b)(6) (incorporated by Fed. R. Bankr. P. 7012).[25]  By

order dated June 14, 2012, I granted in part and denied in part WSFS' motion to dismiss the

amended complaint.  (Id., Doc. # 43).  I also granted the Trustee leave to file a second amended

complaint.  Initially, the Trustee did not do so.  WSFS then filed an Answer to the Amended

Complaint on July 18, 2012.

On December 6, 2013, the Trustee filed a motion seeking leave to file a second amended

complaint.  (Id., Doc. # 129).  WSFS objected.  By Order dated January 15, 2014, I granted the

motion.  (Id., Doc. # 161).  The Trustee filed his second amended complaint ("the Second

Amended Complaint") on January 24, 2014.  (Id., Doc. # 170).  WSFS filed its Answer on

February 19, 2014.  (Id., Doc. # 176).

Six (6) of the original ten (10) claims pleaded in the Amended Complaint survived

WSFS' Motion to Dismiss Case, in whole or in part.  Those surviving claims are:

**Count One -**    in contract, for breach of the implied duty of good faith and
fair dealing;

**Count Two -**    breach of contract;

---

[25]        The somewhat tortuous procedural history of the Rule 12(b) litigation in this adversary
proceeding is outlined in the court's order dated June 14, 2012.  (Id., Doc. # 43).  It is unnecessary to
repeat it here.

**Count Three -**    under 6 Del. C. §4A-305 for failure to execute two (2) "payment orders;"

**Count Six -**    avoidance and recovery of fraudulent transfers under 11 U.S.C. §§544 and 550;

**Count Seven -**    avoidance and recovery of fraudulent transfers under 11 U.S.C. §§548 and 550;

**Count Eight -**    avoidance of setoff under 11 U.S.C. §§553 and 550.[26]

By order dated September 24, 2012, after consideration of their Rule 26(f) Discovery Report, a number of conferences with counsel and additional status reports, I entered a pretrial order that set July 31, 2013 as the deadline for completion of all discovery. (Adv. No. 11-512, Doc. # 69). The parties then engaged in extensive discovery – for the most part, in a collaborative, cooperative manner – and requested a number of extensions of the discovery deadline. By virtue of Pretrial Order #10, dated April 23, 2014, all discovery concluded on June 18, 2014. (Id., Doc. # 182).

On May 30, 2014, the Trustee filed a motion for partial summary judgment, seeking

---

[26]    The four (4) dismissed claims were:

**Count Four -** a claim for breach of fiduciary duty;

**Count Five -** a claim for declaratory judgment that WSFS is no longer a secured creditor of UDI and is obligated to file a termination statement as to its UCC-1;

**Count Nine -** a preference claim under 11 U.S.C. §547;

**Count Ten -** a request that the court disallow any claim of WSFS until or unless WSFS pays the amount of any transfers that are avoided in this adversary proceeding, see 11 U.S.C. §502(j).

**Count Three** (the claim pursuant to 6 Del. C. §4A-305 for failure to execute two (2) payment orders) was not dismissed, but WSFS' motion was granted insofar as the Trustee sought relief in the form of consequential damages.

summary judgment as to liability only with respect to Counts One, Two, Three, Six and Seven. (Id., Doc. # 193).  The Trustee supported his motion with evidentiary matter and a memorandum of law.  On July 31, 2014, WSFS filed its response to the Trustee's Motion and its own motion for summary judgment with accompanying evidentiary matter and a memorandum of law.  (Id., Doc. # 206).  Each side then filed reply memoranda, the last of which was filed on September 11, 2014.  (Id., Doc. #'s 213, 216).

## IV.  SUMMARY JUDGMENT STANDARD

Fed. R. Civ. P. 56(a), applicable in this adversary proceeding by virtue of Fed. R. Bankr. P. 7056, provides that summary judgment must be granted to a moving party when, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  E.g., Tri-M Group, LLC v. Sharp, 638 F.3d 406, 415 (3d Cir. 2011); In re Bath, 442 B.R. 377, 387 (Bankr. E.D. Pa. 2010).  Summary judgment is appropriate if there are no disputed issues of material fact and the undisputed facts would require a directed verdict in favor of the movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

On a motion for summary judgment, the court's role is not to weigh the evidence, but to determine whether there is a disputed, material fact for resolution at trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  A genuine issue of material fact is one in which sufficient evidence exists that would permit a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248.  However, if it appears that the evidence "is so one-sided that one party must prevail as a matter of law," the court shall enter judgment accordingly in that party's

favor.  Id. at 252.

Proper resolution of a motion for summary judgment also requires consideration of the parties' respective burdens.

If the moving party bears the burden of proof, the movant must "support its motion with credible evidence  .  .  .  that would entitle it to a directed verdict if not controverted at trial." Fitzpatrick, 2 F.3d at 1115 (citation omitted).  The evidence must establish "all the essential elements of its case on which it bears the burden of proof at trial, [such that] no reasonable jury could find for the non-moving party."  Id. (citation omitted); see also Bath, 442 B.R. at 387.  If the movant (with the burden of proof at trial) meets this initial burden, the responding party may not rest on the pleadings, but must designate specific factual averments through the use of affidavits or other permissible evidentiary material which demonstrate a genuine issue of material fact to be resolved at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson, 477 U.S. at 247-50.

If the moving party does not bear the burden of proof at trial, the movant may establish it is entitled to judgment either by demonstrating that the undisputed facts negate an element of the plaintiff's claim or that the plaintiff lacks evidence to support an essential element of his claim. In re Polichuk, 506 B.R. 405, 422 (Bankr. E.D. Pa. 2014) (citing Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996) and Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 868 F. Supp. 1278, 1287 n.5 (D. Utah 1994)).

In this adversary proceeding, with respect to certain claims, WSFS contends that the Trustee's evidence is insufficient to permit this dispute to proceed to trial.  Thus, WSFS' burden on summary judgment "may be discharged by 'showing' – that is, pointing out to the [trial] court

– that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v.</u>

<u>Catrett</u>, 477 U.S. 317, 325 (1986).[27]


# V.  WSFS IS ENTITLED TO SUMMARY JUDGMENT ON THE TRUSTEE'S CONTRACT CLAIMS  (COUNTS ONE AND TWO)

In Counts One and Two of the Second Amended Complaint, the Trustee asserts two (2)

distinct breach of contract claims pertaining to the Loan and the CMA: (1) breach of express

contractual provisions and (2) breach of the implied covenant of good faith and fair dealing.


## A.  Threshold Issue: the Relationship between the Loan and the CMA

Prior to evaluating whether there was a breach of contract under either theory, I must

consider the relationship between the Loan and the CMA.  The Trustee contends that the Loan

and CMA are separate contracts.  (Trustee Reply Memorandum Support of Summary Judgment

at 3; Adv. No. 11-512, Doc. # 213) ("Tr. Reply").  WSFS disagrees, arguing that the Loan and

---

[27]        [W]hen a movant contends a nonmovant lacks crucial evidence, this factual contention must be supported in the same manner as any other factual contention made in a summary judgment motion, by reference to disclosure and discovery materials, admissions, affidavits or declarations, and the like. The evidentiary support for this assertion probably does not have to be thorough and detailed as when a movant attempts to show that the facts are undisputed.  Nonetheless, because the rule explicitly requires a "showing," there must be at least enough evidentiary support for the assertion that the nonmovant lacks crucial evidence to demonstrate the movant's good faith.  The nonmovant and the court should not face the burdens imposed by a summary judgment when the movant has no basis for its assertion.

<u>Polichuk</u>, 506 B.R. at 405 (quoting 11-56 <u>Moore's Federal Practice - Civil</u> §56.40[1](b)[iv] (LexisNexis 2013)) (emphasis omitted).

CMA were part of a larger integrated business lending transaction that requires the documents to

be interpreted as a single agreement in order to give effect to the parties' intent.

The distinction is important.  If the Loan and the CMA are part of a single contractual

relationship, WSFS' argument that UDI's alleged material breach of the Loan excuses

performance under the CMA gains traction.

**1.  contract interpretation**

It is a well settled under Delaware contract law,[28] that the best evidence of the parties'

intent is the written contact.  <u>Paul v. Deloitte & Touche LLP</u>, 974 A.2d 140, 145 (Del. 2009)

(explaining that court must look to the "four corners of the contract to conclude whether the

intent of the parties can be determined from its express language").

> It is the duty of a Court to give effect to the intentions of the parties to a contract,
> the writing being the embodiment of a jural act by the parties.  In well-drawn and
> unambiguous contracts . . . the plain meaning of the words used by the parties will
> be given full force and effect, and extrinsic evidence will not be admitted.

<u>Schwartz v. Centennial Ins. Co.</u>, 1980 WL 77940, at *5 (Del. Ch. Jan. 16, 1980) (citations

omitted); <u>accord</u> <u>Northwestern Nat'l Ins. Co. v. Esmark, Inc.</u>, 672 A.2d 41, 43 (Del. 1996);

<u>Tenneco Auto. Inc. v. El Paso Corp.</u>, 2002 WL 453930, at *1 (Del. Ch. Mar. 20, 2002).

A further axiom of contact interpretation is that related agreements are to be read together

as one contract.  <u>Ashall Homes Ltd. v. ROK Entm't Grp. Inc.</u>, 992 A.2d 1239, 1251 (Del. Ch.

2010); <u>accord</u> <u>In re Northwestern Corp.</u>, 313 B.R. 595, 601 (Bankr. D. Del. 2004) ("all related

---

[28]        The BLA, the Note and the CMA each state that the agreement is governed by Delaware
law.  Neither party has questioned that proposition.

-32-

documents and instruments in a single transaction together are harmonized to the extent

possible").  "[T]he principle that all writings which are part of the same transaction are

interpreted together also applies when incorporation by reference of another writing may be

inferred from the context surrounding the execution of the writings in question."  Williston on

Contracts §30:26 (4th ed. (rev.) 2007) ("Williston"); accord CA, Inc. v. Ingres Corp., 2009 WL

4575009, at *47 (Del. Ch. Dec. 7, 2009); Simon v. Navellier Series Fund, 2000 WL 1597890, at

*7 (Del. Ch. Oct. 19, 2000).


## 2.  integration

Where one party to a contract seeks to vary the terms of a written contract, the parol

evidence rule is implicated.  The parol evidence rule states "where parties have reduced their

ultimate agreement to writing, the writing cannot thereafter be varied or contradicted."  McGrew

v. Vanguard Corp., 1979 WL 4635, at *3 (Del. Ch. Sept. 25, 1979); accord Taylor v. Jones, 2002

WL 31926612, at *3 (Del. Ch. Dec. 17, 2002).  The application of the parol evidence rule

operates to exclude "an antecedent or contemporaneous oral understanding to vary or contradict

the terms of a written contract."  Brandywine Shoppe, Inc. v. State Farm Fire & Casualty Co.,

307 A.2d 806, 809 (Del. Super. Ct. 1973).

Related to the parole evidence rule is the concept of contract integration.  A distinction

exists between contracts that are totally integrated and those only partially integrated:

> Where the writing is intended to be final and complete, it is characterized as a
> total integration and may be neither contradicted nor supplemented by evidence of
> prior agreements. But where a writing is intended to be final but is in fact
> incomplete it is said to consist of a partial integration and although such a writing
> may not be contradicted by evidence of prior agreements, it may be supplemented
> by additional consistent evidence.

-33-

McGrew, 1979 WL 4635, at *3 (footnote omitted).

In determining whether the contract is fully or partially integrated, courts consider several factors, including whether the contact contains a merger or integration clause, the length and detail of the contract, the formality of the setting, and whether the contract is a form.  See 6-25 Peter Linzer, Corbin on Contacts §25.7 (Joseph M. Perillo, ed.) (Matthew Bender 2015) ("Corbin"); see also Hynansky v. Vietri, 2003 WL 21976031, at *3 (Del. Ch. Aug. 7, 2003); Taylor, 2002 WL 31926612, at *3.

Once it has been established that a contract is not fully integrated, the court may consider extrinsic or parol evidence regarding whether the parties intended to include other terms or agreements in the contract to supplement (but not vary or contradict) the written terms of the contract.  Corbin §25.7; see also Brandywine Shoppe, 307 A.2d at 809.

In this proceeding, I must apply these principles to determine whether the Loan and the CMA were each fully integrated, independent contracts or whether each was only partially integrated and supplemented by the provisions of the other.


### 3.  the Loan and CMA each were only partially integrated

The inclusion of an integration clause[29] in a written contract is evidence that a contract is fully integrated, but by itself, is not conclusive.  Li v. Standard Fiber, LLC, 2013 WL 1286202, at *7 n.57 (Del. Ch. Mar. 28, 2013); MicroStrategy Inc. v. Acacia Research Corp., 2010 WL

---

[29]     An integration clause is a statement in the parties' written contract that the writing is intended to be the final expression of their agreement.  See Restatement (Second) of Contracts §209, cmt. b ("Restatement"); Middletown Concrete Products, Inc. v. Black Clawson Co., 802 F. Supp. 1135, 1145-46 (D. Del. 1992).

5550455, at *13 (Del. Ch. Dec. 30, 2010).  In this matter, the Loan has an integration clause, (see Ex. W-14, WSFS 00270, BLA ¶ 6.8),[30] but it is not possible at summary judgment, to determine whether the CMA has one.[31]

The Note expressly incorporates the BLA, (Note, Preamble) and refers to the BLA and the other Loan Documents as one collective transaction or one interrelated instrument.  (Ex. W-14, WSFS 00276, Note ¶ 3(a)).  More to the point, the Note specifically provides that UDI must maintain its primary deposit account and cash management relationship with WSFS and the failure to do so constituted an event of default.  (Id., WSFS 00278, Note ¶ 6(d); see also id., WSFS 00264, BLA ¶ 4.1(k)).  This requirement merged the lending and banking relationships.

It is therefore readily apparent that the CMA was only one (1) part of the larger transaction which included WSFS' agreement to lend UDI $5 million for working capital.  The Trustee has offered no extrinsic evidence to dispute that the Loan and CMA were two (2) parts of a single package.

These undisputed facts establish that the Loan and CMA both were only partially integrated.  Each writing was the final manifestation of the agreements on the subjects addressed within each agreement.  However, neither one, standing alone, represented the parties' complete agreement.  Each agreement supplemented the other, together forming a single integrated

---

[30]    The integration clause states that the "Loan Documents" (the defined term encompassing the other documents executed in connection with the credit transaction) "constitute the entire agreement and understanding between the parties hereto and supersedes any and all prior agreements and understandings, oral or written, relating to the Loan."

[31]    The integration clause in the CMA is part of the General Terms and Conditions Attachment.  As stated earlier, see n.12, the Trustee disputes the authenticity of the General Terms and Conditions Attachment.

transaction.  Consequently, the Loan and CMA must be interpreted together as parts of a single contract.

### B.  Trustee's Claim for Breach of Express Contract Provisions (Count Two)

Three (3) elements are required to establish breach of contract under Delaware law: (1) the existence of a contract whether express or implied; (2) the breach of an obligation imposed by that contract; and (3) the resultant damage to the plaintiff.  VLIW Technology, LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003); eCOMMERCE Indus., Inc. v. MWA Intelligence, Inc., 2013 WL 5621678, *13 (Del. Ch. Sept. 30, 2013); In re Mobilactive Media, LLC, 2013 WL 297950, at *14  (Del. Ch. Jan. 25, 2013).  The plaintiff has the burden to establish these elements by a preponderance of the evidence.  Mobilactive Media, 2013 WL 297950, at *14; LaPoint v. AmerisourceBergen Corp., 2007 WL 2565709, at *9 (Del. Ch. Sept. 4, 2007).

### 1.  WSFS Non-Performance under the CMA was excused by UDI's material breach of the Loan

#### a.

The Trustee's first argument under Count Two is that WSFS breached the CMA through the implementation of the PND and other actions that restricted UDI's use of services that were provided under the CMA.  The Trustee also makes the related argument that WSFS committed a breach of its express contractual duties by failing to perform all of its obligations under the CMA without prior notice.  In response, WSFS asserts that it was excused from fully performing under the CMA due to UDI's material breach of its obligations under the Loan Documents.

WSFS is correct on the law.  "A party is excused from performance under a contract if the

other party is in material breach thereof."  BioLife Solutions, Inc. v. Endocare, Inc., 838 A.2d

268, 278 (Del. Ch. 2003) (citing Moore Bus. Forms v. Cordant Holdings Corp., 1998 WL 71836,

at *8 & n.35 (Del. Ch. Feb. 6, 1998, revised Mar. 5, 1998)); accord Daystar Const. Mgmt., Inc. v.

Mitchell, 2006 WL 2053649, at *7 (Del. Super. July 12, 2006).[32]

Based on this legal principle, if UDI materially defaulted under the Loan, it is appropriate

to treat the default provisions of the Loan as either terminating WSFS' ongoing obligations under

the CMA or at least modifying those obligations to relieve WSFS of the obligation to perform

those CMA obligations that were inconsistent with or that would undermine the efficacy of its

loan default remedies.  As stated earlier, the CMA and the Loan were two (2) parts of a single,

integrated transaction.  It would be illogical to construe the transaction documents as permitting

WSFS to declare a default under the Loan Documents and exercise its default and collection

remedies only to have the exercise of those remedies trigger a breach of its obligations under the

CMA.  See GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P., 36 A.3d 776, 779

(Del. 2012) ("The meaning inferred from a particular provision cannot control the meaning of the

entire agreement if such an inference conflicts with the agreement's overall scheme or plan."

(citing E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co., 498 A.2d 1108, 1113 (1985))).

Consequently, the merits of the Trustee's breach of contract claim boils down to two (2)

questions:

(1) Was UDI in default of the Loan?

---

[32]   Conversely, a slight breach by one party to a contract will not terminate the obligations
of the injured party to perform.  Daystar Const., 2006 WL 2053649, at *7.

(2) If so, was the default material?

Based on the undisputed facts, the answer to both questions is "yes." The summary judgment record establishes as a matter of law that UDI was in material breach of the Loan Documents at the time WSFS took action after discovering the existence of the Red Notice. Therefore, WSFS was authorized to accelerate the Loan and was not required to strictly perform all of its obligations under the CMA and did not breach its contractual duties to UDI.

### b.

The BLA identifies fourteen (14) "Events of Default."  (Ex. W-14, WSFS 00266-00267, BLA ¶ 5.1(a)-(n)).  WSFS has established on this record that at least two (2) events of default under the BLA occurred before it exercised its loan default remedies.

One event of default occurred under Paragraph 5.1(h) of the BLA, which states that the following constitutes an event of default: "[UDI] makes any material false or misleading statement, certificate, representation or warranty to [WSFS]."

Among the representations and warranties that UDI made to WSFS in the BLA were that:

- the financial statements that UDI and Singh delivered to UDI were true and correct and presented their financial position fairly accurately and completely;

- UDI had disclosed in writing all facts that could have a material adverse effect on its business and financial condition or any loan collateral; and

- UDI was not obligated under any guaranty other than a guaranty in favor of WSFS.

(Id., WSFS 00261, BLA ¶ 3.1(e), (f), (g)).

WSFS has produced evidence, unrebutted by the Trustee, that UDI made the following misrepresentations to WSFS:

- UDI submitted false financial statements which overstated UDI's cash position by more than $2 million and its net worth by over $3.3 million;[33]

- UDI falsely represented that there were no inter-company balances;[34]

- UDI falsely represented that it had no guarantee obligations, when it had $32 million in guarantee obligations;[35]

- UDI failed to disclose significant losses caused by environmental factors at the Duncan gas stations which was the subject of a lawsuit at the time.[36]

Another event of default occurred under Paragraph 5.1(b) of the BLA, which states that the following constitutes an event of default: the occurrence of an "Event of Default" under any of the other Loan Documents.  An event of default occurred under another one of the Loan Documents: specifically, Paragraph 7 of the Guaranty.

Paragraph 7 of the Guaranty provided that an event of default occurs if any information given by Singh or UDI in connection with the Loan is not accurate in all material respects or if either Singh or UDI "omitted to state any material fact or any fact necessary to make such information not misleading."  In the Certificate of Guaranty Singh submitted to WSFS, Singh falsely certified that "[t]here is no suit, action, or proceeding pending, or threatened against or

---

[33]     (Ex. W-16, Dovell Dep. at 33; Ex. W-17, Dovell Report at 8-11, 14-15).

[34]     (Ex. W-17 Dovell Report at 15-19).

[35]     (Ex. W-17, Dovell Report at 12-14; Ex. W-90, Manderino Report at 11).

[36]     I recognize that the environmental litigation involved a number of the properties owned by other Universal Network entities, not UDI.  However, given UDI's role as manager of numerous Universal Network entities, the litigation undoubtedly could have had an adverse impact on UDI's business and financial condition (within the meaning of ¶ 3.1(e) of the BLA).

affecting the Guarantor before or by any court, administrative agency, [or] other governmental

authority."  (Ex. W-14, WSFS 00332, Certificate of Guarantor ¶ 3).

Singh's failure to disclose the existence of the litigation against him in India and the Red

Notice (in the name of his undisclosed alias, Batra) constituted an event of default under the

Guaranty and therefore under Paragraph 5.1(b) of the BLA.

### c.

The next question is whether UDI's default under the Loan Documents, on account of the

material misrepresentations regarding UDI and Singh's financial condition and the failure to

disclose the Red Notice and the pending criminal charges in India against Singh, were material

breaches that excused further strict contractual performance by WSFS.  I conclude they were.

The determination whether a breach is sufficient to excuse further performance under a

contract is one of degree.  Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc., 2013 WL

3934992, at *11 (Del. Ch. July 24, 2013).  A material breach is action or inaction that goes to the

root or "essence of the agreement between the parties, or . . . which touches the fundamental

purpose of the contract and defeats the object of the parties in entering into the contract."  Id.  It

must be "of sufficient importance to justify by the non-breaching party."  Biolife Solutions, 838

A.2d at 278.

"A misrepresentation is material if it would be likely to induce a reasonable person to

manifest his assent, or if the maker knows that it would be likely to induce the recipient to do

so."  Restatement §162(2); accord Alabi v. DHL Airways, Inc., 583 A.2d 1358, 1362 (Del.

Super. Ct. 1990).  Further, a party may assert that its nonperformance is excused by the other

party's material breaches, **even if it was not aware of those breaches at the time it terminated or modified its performance under the parties' contract**.  See, e.g., Eastern Elec. & Heating, Inc. v. Pike Creek Professional Ctr., 1987 WL 9610, at *5 (Del. Super. Ct. Apr. 7, 1987); see also Schiavello v. Delmarva Sys. Corp., 61 F. Supp. 2d 110, 114 (D. Del. 1999) (after-acquired evidence of resume fraud is complete defense to breach of contract claim); Davenport Group MG, L.P. v. Strategic Inv. Partners, 685 A.2d 715, 724 (Del. Ch. 1996) (later-discovered information of wrongdoing is defense to wrongful discharge suit).

The determination of materiality is usually a question of fact.  Norfolk S. Ry. Co. v. Basell USA Inc., 512 F.3d 86, 92 (3d Cir. 2008) (citing Saienni v. G & C Capital Group, Inc., 1997 WL 363919, at *3 (Del. Super. Ct. May 1, 1997)); 23 Williston §63:3.  However, the materiality determination does not always preclude summary judgment.  "[I]f the issue is disputed  .  .  .  [but] there is only one reasonable conclusion, a court must address what is ordinarily a factual question as a question of law."  23 Williston §63:3; accord Norfolk, 512 F.3d at 92 (applying Delaware law); Saienni, 1997 WL 363919, at *2, 3.[37]

Here, consistent with its usual underwriting practices, before it entered into the lending relationship with UDI, WSFS required that UDI and Singh provide financial statements and related financial information.  (Ex. W-19, Foley Dep. at 6-9).  WSFS analyzed this information

---

[37]     Separate and apart from the contractual analysis employed above in the text, (i.e., UDI's material breach of express contractual provisions excused WSFS' performance), Delaware law provides, more generally, that a contract may be voidable on the basis of misrepresentation, be it a fraudulent or an innocent misrepresentation.  See Alabi, 583 A.2d at 1361.  Such a misrepresentation may be asserted as an affirmative defense to a contract action.  Id.  In asserting misrepresentation as a defense, a party must establish that: (1) there was a misrepresentation; (2) the misrepresentation was either fraudulent or material; (3) the misrepresentation induced the recipient to enter into the contract; and (4) the recipient's reliance on the misrepresentation was reasonable.  Id. at 1361-62 (citing Restatement §164); Tekstrom Inc. v. Savla, 2006 WL 2338050, at *5 (Del. Super. Ct. July 31, 2006).

in the form of a credit memo presented to its Senior Loan Committee, which  assessed UDI's

financial strength and the risk of extending credit.  Based upon the information and risk analysis

contained in that memo, WSFS granted UDI the Loan.  (See Ex. W-37, Kocher Dep. at 18-19).

 The Credit Memo referred specifically to UDI's cash position of $2.1 million as

"sufficient."  (Ex. W-31, WSFS 00530).  As for Singh, UDI representatives required his guaranty

before the Credit Memo was submitted to the Senior Loan Committee.  (See W-37; Kocher Dep.

at 20).  At the Senior Loan Committee level, the Credit Memo separately analyzed the financial

status of Singh, its guarantor.  (Ex. W-31, WSFS 00532).

This record establishes, as a matter of law, that the misrepresentations in UDI's financial

disclosures substantially contributed to WSFS' extension of credit under the Loan.  Alabi, 583

A.2d at 1363 ("A misrepresentation induces a party's manifestation of assent if it substantially

contributes to his decision to manifest his assent." (citation omitted)); see also Kirchner v. Stief,

2001 WL 1555313, at *3  (Del. C.P. 2001) ("It is assumed, in absence of facts showing the

contrary, that the recipient attached importance to the truth of the misrepresentation…" (quoting

Alabi, 583 A.2d at 1363)).  In fact, the BLA itself states that the financial and related covenants

induced WSFS to make the Loan to UDI.

Similarly, as a matter of law, Singh's nondisclosure of the pending proceedings against

him in India, was a material breach of his contractual disclosure obligations under the Guaranty.

The record demonstrates that WSFS made the Loan largely on the strength of its confidence in

UDI's ability to generate sufficient cash flow.  (See Ex. W-31, Credit Mem.; Ex. W-37, Kocher

Dep. at 28).  UDI's financial strength, in turn, was based on its success as a functioning cog in

the Universal Network.  The Credit Memo confirms that WSFS was well aware that Singh was

the principal of all of the key Universal Network entities.  In these circumstances, it is obvious

that WSFS' decision to grant the loan necessarily depended on its confidence in Singh as the

principal of UDI and the other Universal Network entities.  See Ronald J. Mann, Article: The

Role of Secured Credit in Small-Business Lending, 86 Geo. L.J. 1, at *6, 23-24 (Oct. 1997)

(discussing lenders' uniform practice of securing personal guarantee and describing guarantee as

"a major force" in small business lending where "the most important effect of the guaranty is not

the direct enhancement of the creditor's right to collect payment forcibly, but is instead the

improvement of the borrower's incentives"); see also David Hahn, Personal Bankruptcy in the

21st Century: Emerging Trends and New Challenges: Velvet Bankruptcy, 7 Theoretical Inq. L.

523, 531-32 (July 2006) (banks' demand for personal guarantees is "a contractual bypass of the

legal principle of limited liability" which serves as a "bonding device that combats the perils of

excessive risk-taking at the corporate level").  This renders material the nondisclosure of the

prior legal proceedings against him in India and the existence of the Red Notice international

arrest warrant, nondisclosures that constituted events of default under Paragraph 7 of the

Guaranty and Paragraph 5.1 of the BLA.  See RTP LLC v. ORIX Real Estate Capital, Inc., 2014

WL 4414512, at *7-8  (N.D. Ill. Sept. 8, 2014) (holding guarantor's failure to disclose lawsuit in

which court imposed a temporary restraining order was material breach under loan agreement).

In short, WSFS having established that UDI was in material breach of the Loan at the

time that WSFS discovered the existence of the Red Notice, the Trustee cannot succeed on his

claim for express breach of WSFS' contractual obligations under the CMA.

### 2.  WSFS did not commit a breach of contract by failing to give prior notice before exercising its remedies under the Loan Documents

The Trustee also argues that WSFS committed a breach of contract by failing to give UDI prior notice before it exercised its Loan default remedies.  The argument is without merit.[38]

The express terms of the BLA provided WSFS with the right to accelerate the Loan without a declaration of default and without notice to UDI.  (Ex. W-14, WSFS 00267, BLA ¶ 5.2(a), (b)).  The Trustee seeks to vitiate the effect of this express contractual provision, arguing that the notice provisions in the Loan Documents are ambiguous because some of the remedial provisions require that notice be given to UDI while others are silent on the subject.  (Tr. Reply Mem. at 5).  Based on this purported ambiguity, the Trustee invokes the doctrine of contra proferentum and asks the court to construe the notice provisions against the drafter of the contract.  He requests the court to read into the provisions of the Loan Documents that lack an express prior notice requirement, a duty to provide prior notice before exercising default remedies.  (Id. at 5-6).

As a general rule, contract terms should be given their plain and ordinary meaning.  E.g., AT&T Corp. v. Lillis, 953 A.2d 241, 252 (Del. 2008); 11 Williston §32.3.  A contract term or provision is ambiguous only "[w]hen the provisions in controversy are fairly susceptible of

---

[38]    In his initial brief, the Trustee argued that WSFS breached the CMA by WSFS' failure to give notice required by **the CMA** before altering its performance of its CMA obligations.  That argument fails for the reasons expressed in the immediately preceding Part V.B.1, supra.  The Trustee has no claim for breaches of the CMA due to UDI's prior material breaches of the Loan.

In his Reply brief, the Trustee put forward a variation on that argument.  He asserted, for the first time, that WSFS' exercise of its loan default remedies in a manner that breached its CMA obligations were taken in breach of WSFS' prior notice obligation **under the Loan Documents**.  (Tr. Reply Mem. at 5-6).  I address this argument in the text below.

different interpretations or may have two or more different meanings." GMG Capital Invs., 36

A.3d at 780 (quoting Eagle Indus. v. DeVilbiss Health Care, 702 A.2d 1228, 1232 (Del. 1997));

accord Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1196 (Del.

1992).  However, a contract is not ambiguous simply because the parties do not agree on its

proper meaning.  GMG Capital Invs., 36 A.3d at 780.

In the event of an ambiguity, sometimes courts will "adopt the meaning that is less

favorable in its legal effect to the party who chose the words .  .  . [a] technique known

.  .  . as 'contra proferentem.'"  5-24 Corbin §24.27; accord 11 Williston §32:12.  Under

Delaware law, courts may apply this principle if alternative formulations indicate that the

ambiguous provision could easily have been made clear by the drafting party.  Twin City Fire Ins.

Co. v. Delaware Racing Ass'n, 840 A.2d 624, 630 (Del. 2003) (citing Kaiser Alum. Corp. v.

Matheson, 681 A.2d 392, 399 (Del. 1996)).

In his submission, the Trustee did not go through the Loan Documents and identify those

remedies that require prior notice and flesh out the ambiguity he claims exists.  Presumably, he is

referring to ¶ 6(a) and (b) of the Note, which require fifteen (15) days prior notice before WSFS

declares certain monetary defaults.  Interestingly, the very next subparagraph of the Note, ¶ 6(c),

authorizes WSFS to declare a default without notice in the event of a materially adverse change

in UDI's financial condition or with respect to the collateral of the Loan.  In any event, there is

no ambiguity in the provisions of the Loan Documents.

The Trustee's argument fails because there is no contractual ambiguity on the subject of

prior notice.

The BLA expressly states that WSFS may accelerate the Loan without a declaration of

default and exercise its default remedies without notice to UDI.  (Ex. W-14, WSFS 00267, BLA

¶ 5.2(a), (b)).  The existence of a generally applicable provision, stating that notice is not required

for declaration of a default and the exercise of a party's remedies, with another provision

imposing a notice requirement before a default may be declared based on a certain, specific

ground, does not create an ambiguity.  As the <u>Restatement</u> points out, the specific may control

over the general, but only in the context in which it is found in a contract; it does not replace or

supersede the general contract provision:

> [I]n case of conflict the specific or exact term is more likely to express the
> meaning of the parties with respect to the situation than the general language . . .
> [but if] the specific or exact can be read as an exception or qualification of the
> general, both are given some effect.

<u>See</u> <u>Restatement</u> §203, cmt. e.

Here, there is neither an internal conflict within the BLA nor a direct conflict between the

BLA and another one of the Loan Documents.  WSFS declared a default and exercised its default

remedies based on a non-monetary default for which there is no express contractual duty to give

prior notice.  The fact that there are other events of default as to which there is a duty to give

notice does not create an ambiguity or vitiate WSFS' express right to act without notice

following a non-monetary default.

Accordingly, the Trustee has not identified any specific contract provision mandating

prior notice with which WSFS failed to comply.[39]

---

[39]    The Trustee's argument also fails because the doctrine of <u>contra proferentem</u> is **not**
applied where both parties have contributed to the drafting of a contract.  <u>See</u> <u>Sodano v. Am. Stock Exch.
LLC</u>, 2008 WL 2738583, at *13 n.71 (Del. Ch. July 15, 2008), <u>aff'd sub nom.</u>, <u>Am. Stock Exch. LLC v.
Fin. Indus. Regulatory Auth., Inc.</u>, 970 A.2d 256 (Del. 2009).  WSFS produced evidence that the notice
provisions of the contracts were negotiated by counsel.  (<u>See</u> Ex.W-9, Ryan Dep. at 106, 109).  The
doctrine of <u>contra proferentem</u> is not applicable in these circumstances.

### C.  Implied Covenant of Good Faith and Fair Dealing (Count One)

The implied covenant of good faith and fair dealing requires contracting parties to

"'refrain from **arbitrary or unreasonable conduct** which has the effect of preventing the other

party to the contract from receiving the fruits' of the bargain." Dunlap v. State Farm Fire & Cas.

Co., 878 A.2d 434, 442 (Del. 2005) (emphasis added) (quoting Wilgus v. Salt Pond Inv. Co., 498

A.2d 151, 159 (Del. Ch. 1985)); accord Nemec v. Shrader, 991 A.2d 1120, 1126 (Del. 2010).

Breaching the covenant may create liability for parties whose "conduct frustrates the

'overarching purpose' of the contract by taking advantage of their position to control

implementation of the agreement's terms." Dunlap, 878 A.2d at 442 (citing Breakaway

Solutions, Inc. v. Morgan Stanley & Co. Inc., 2004 WL 1949300 *12 (Del. Ch. Aug. 27, 2004)).

The doctrine may be used to imply contract terms, "whether employed to analyze unanticipated

developments or to fill gaps in the contract's provisions." Dunlap, 878 A.2d at 441 (footnote

omitted).

The Delaware Supreme Court has emphasized the limited nature of the implied covenant

of good faith and fair dealing.  A contracting party's reliance on the express terms of an

agreement does not amount to bad faith merely because such reliance "simply limits advantages

to another party." Nemec, 991 A.2d at 1128.  Therefore, applying the implied covenant to find

that a party breached its obligations by the manner in which it employed an express contractual

right is a "cautious enterprise." Id. at 1125 (citing Dunlap, 878 A.2d at 441).  This is necessarily

so because a plaintiff "generally cannot base a claim for breach of the implied  covenant on

conduct authorized by the agreement." Id. at 1125-26.

Application of the implied covenant involves a "rare and fact-intensive exercise," Dunlap

878 A.2d at 442 (quoting Cincinnati SMSA Ltd. Partnership v. Cincinnati Bell Cellular Systems Co., 708 A.2d 989, 992 (Del. 1998)), to be employed "[o]nly when it is clear from the writing that the contracting parties 'would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter,'" Dunlap, 878 A.2d at 442 (quoting Katz v. Oak Industries, Inc., 508 A.2d 873, 880 (Del. Ch. 1986)).

Stated slightly differently, and consistent with the contractual foundation of a claim for breach of an implied contractual duty,

> Delaware's implied duty of good faith and fair dealing is not an equitable remedy for rebalancing economic interests after [subsequent] events . . . adversely affected one party to a contract. Rather the covenant is a limited and extraordinary legal remedy.

eCOMMERCE Indus., 2013 WL 5621678, at *33 (citing Nemec, 991 A.2d at 1128).

A claim arising from a breach of the implied covenant is itself contractual in nature. NAMA Holdings, LLC v. Related WMC LLC, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014) (internal quotations and citations omitted).  Thus, the elements of the claim are the same as those for an ordinary breach of contract claim, the only difference being that contractual obligation breached is implied, not express.  See NAMA Holdings, 2014 WL 6436647 at *16 (quoting Fitzgerald v. Cantor, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).  The implied covenant is not met by "[g]eneral allegations of bad faith conduct."  Kuroda v. SPJS Holdings, LLC, 971 A.2d 872, 888 (Del. Ch. 2009).  Instead, Delaware courts require the plaintiff to identify a specific implied obligation and to demonstrate that the breach of that obligation "denied the plaintiff the fruits of the contract."  Id.

As explained in Part V.B. above, following a material breach by UDI, WSFS exercised its default remedies under the Loan.  Based on the implied covenant of good faith and fair dealing,

the Trustee argues that the manner in which WSFS implemented its default remedies was

unreasonable and in bad faith.  He contends that WSFS breached the implied duty of good faith

and fair dealing by placing the administrative freeze on UDI's accounts, sequestering $5 million

to an internal account for the purpose of setting off the Loan, and failing to give notice to UDI of

the administrative freeze and the sequestration of funds.

The Trustee's contention, that WSFS' conduct was arbitrary and unreasonable, is not

supported by the undisputed facts in the record.

For the few days the PND was in effect, WSFS continued to honor requests for transfers

and otherwise made funds available to UDI.[40]  The PND only removed automation from the

process, thereby enabling WSFS to manually ensure there were available funds in the accounts

sufficient to cover the transfers (and to stop payment if the available funds were insufficient).

(Ex. W-7, Brogan Dep. at 78-79, 82).  The net effect was that the PND merely stopped the

automatic funding of outgoing transfers with provisional or advance credit.  WSFS had the right

to do this in light of UDI's material breach of the parties' contract.

Thus, there is no evidence that UDI lacked all access to its funds.  Rather, from July 15 to

July 22, 2009, UDI transferred over $11 million from its accounts (**not including** the $5 million

used to repay the WSFS Loan).  (Ex. W-7, Brogan Dep. at 81-83; Ex. W-8 , Roberts Report at 4,

23-24; Ex. W-12, Manderino Dep. at 113, 116-118).  More specifically, in the week after WSFS

---

[40]      To illustrate, previously accepted outbound ACH transfers from UDI to UMI were
honored and other activity on UDI's deposit accounts proceeded at substantial levels after the PND
restriction was put in place.  This included $2,361,800.00 transferred from UDI to UMI on July 17, 2009
and $1,925,000.00 to UEI on July 20, 2009. (See Ex. 110, July 2009 ACH Payments Account Statement
at WSFS 00987) (transfers to UMI highlighted in yellow); Ex. 112, UDI July 2009 Corporate Check
Payments Statement, at WSFS 01400-06) (check drawn highlighted in pink)).

discovered the Red Notice, WSFS permitted UDI to withdraw from its accounts: $3 million, sent

to UEI; $5.8 million, sent to UMI and sixty-seven (67) payments to third parties totaling

$212,000.00.  (See Ex. W-12, Manderino Dep. at 117-118).  In this regard, it is most telling that

there is nothing in the record that suggests that UDI attempted to write checks or otherwise effect

transfers from its accounts to non-Universal Network third parties **and** was unable to do so

between July 16, 2009 and July 19, 2009, the dates the PND restriction was in effect.[41]

Thus, the uncontroverted facts demonstrate that UDI's accounts were not entirely frozen

and that millions of dollars flowed through them while the PND restriction was in place.  WSFS

continued processing transactions in and out of UDI's accounts, albeit at a slower pace and

without the automatic grant of provisional credit for all transactions provided under the terms of

the CMA.  In effect, the PND did little more than temporarily suspend UDI's ability to take

advantage of the provisional credit facility within the CMA.  And, the Trustee made no showing

that the segregation (and ultimately, the set-off) of the $5 million resulted in a default on any

particular obligation by UMI, UDI or any other entity within the Universal Network.

As for the Trustee's claim that WSFS' actions without prior notice was a distinct breach

of its contractual obligations, the Loan Documents imposed no duty on WSFS to give such

notice.  Nor did WSFS keep UDI in the dark about the limitations imposed on the CMA for very

long. On July 17, 2009 – one day after the PND went into effect – WSFS gave notice to UDI

(through its counsel) that it had: (a) put the PND in place, (b) segregated the $5 million, and (c)

intended to set off the $5 million against the Loan.

---

[41]    In fact, thirteen (13) UDI checks totaling over $15,000.00 issued to third parties posted
on July 17, 2009.  (Ex. W-11, GOL-WSFS 389302).

Aside from the Trustee's over-spin of the factual history,[42] WSFS' conduct was entirely consistent with the terms of the parties' agreement. In the event of default, the Loan provided that WSFS could, without notice, set off the Loan against amounts in UDI's depository accounts.[43] The Loan was conditioned on the CMA being at WSFS and would not have been granted otherwise. Having its cash management system at WSFS was specifically designed to give WSFS security with respect to the Loan. What occurred was exactly what WSFS bargained for before it entered into its commercial relationship with UDI.

In short, WSFS did not overreact; its response to the disturbing information it received about the principal of its customer was not disproportionate. WSFS' conduct was a measured response to its reasonable suspicion that UDI materially defaulted under the Loan Agreement because the principal of a borrower that was transferring large sums of cash on a daily basis was an international fugitive operating under an assumed name. WSFS administered the PND in a manner that was restrictive enough to protect its interests and no more. The undisputed facts

---

[42]   The Trustee's Expert Report of Dan Schechter (Tr. Reply Mem., Ex. A) concluded that WSFS did not act in conformity with prevailing standards and practices within the commercial lending industry. The Report assumes that WSFS was required to declare a default and give notice to UDI under the Loan, that WSFS unqualifiedly froze UDI's accounts when it instituted the PND, and that WSFS did not verify the Red Notice prior to setting off the Loan. The undisputed facts establish that the Trustee's version of the actions WSFS took upon discovery of the Red Notice are simply incorrect or vastly over simplified. As a result, the Schechter Report does not address the factual scenario presented in this proceeding and creates no issue of fact that prevents the entry of summary judgment.

[43]   Paragraph 5.2 of the BLA authorized WSFS to exercise every remedy granted under the Loan Documents. Paragraph 7(b) of the Note authorized WSFS to exercise any rights available to it under the UCC or any applicable law. WSFS' actions were consistent with the UCC and applicable Delaware law. See 6 Del. C. §§9-109(d)(10) (stating Article 9 does not apply to a right of setoff with two exceptions), 9-340 (set-off against deposit accounts), 9-404 (defenses or claims of an account debtor); see also Webster v. Beebe, 24 Del. 314, 317 (Del. 1910) (discussing common law right to setoff under Delaware law); Davis v. 913 North Mkt. St. Pshp., 1996 WL 769326, *2 (Del. Super. Ct. Dec. 12, 1996) (same).

depict bank conduct that is far below the "arbitrary" or "unreasonable" standard required in a

claim for breach of the implied covenant of good faith and fair dealing.  No reasonable factfinder

could find otherwise.[44]


# VII.  WSFS IS ENTITLED TO SUMMARY JUDGMENT ON THE TRUSTEE'S CLAIM UNDER 6 Del. C. §4A (COUNT THREE)

### A.  6 Del. C. §4A-305

Article 4A governs electronic funds transfers, specifically payment orders.  See 6 Del. C.

§§4A-101, et. seq.  Generally, a payment order is "an instruction of a sender to a receiving bank,

transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or

determinable amount of money to a beneficiary."  §4A-103(a)(1).

Article 4A defines several of the relevant terms used to describe a payment order.  A

sender is "the person giving the instruction to the receiving bank."  §4A-103(a)(5).  The

receiving bank is "the bank to which the sender's instruction is addressed."  §4A-103(a)(4).  A

beneficiary bank is "the bank identified in a payment order in which an account of the beneficiary

is to be credited pursuant to the order or which otherwise is to make payment to the beneficiary if

_____

[44]       Generally, the reasonableness of WSFS' actions is a fact issue that would be decided at trial.  However, I conclude that no trier of fact could find that WSFS' conduct was unreasonable, arbitrary or in bad faith.  In these circumstances, a court may grant summary judgment.  See Anderson, 477 U.S. at 251-52 (summary judgment standard is "very close" to directed verdict standard where both inquire whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"); Curley v. Klem, 499 F.3d 199, 210 (3d Cir. 2007) (judge may decide issue of reasonableness once all historical facts are no longer in dispute; see also Mundell v. DBA/DMC Mining Servs. Corp.,2014 WL 7911147, at *4 (M.D. Pa. Apr. 2, 2014) (making mixed-fact law determination at summary judgment based on undisputed historical facts).

the order does not provide for payment to an account." §4A-103(a)(3).  A beneficiary is "the person to be paid by the beneficiary's bank." §4A-103(a)(2).

In essence, a payment order can be broken down into a chain of transactions that may either be "accepted" or "rejected" at any point in the chain.  For instance, a receiving bank may either accept or reject a payment order that the sender transmits.  "[A] receiving bank . . . accepts a payment order when it executes the order." §4A-209(a).  A rejection occurs when the receiving bank issues a notice to the sender either orally, electronically, or in writing that indicates that the receiving bank "is rejecting the order or will not execute or pay the order." §4A-210(a).  Once a payment order is accepted it may not then be later rejected and vice versa.  See Banque Worms v. BankAmerica Int'l, 570 N.E.2d 189, 195 (N.Y. 1991) ("Payments made by electronic funds transfers in compliance with the provisions of article 4A are to be the equivalent of cash payments, irrevocable except to the extent provided for in article 4A").

A payment order is executed by a receiving bank when "it issues a payment order intended to carry out the payment order received by [that] bank."  1-2 Benjamin Geva, The Law of Electronic Funds Transfers §2.03[2] (Matthew Bender 2015) (quoting U.C.C. §4A-301(a)).

Section 4A-305 governs a receiving bank's liability for late or improper execution or failure to execute payment order.  It provides:

> (a) If a funds transfer is completed but execution of a payment order by the receiving bank in breach of Section 4A-302 results in delay in payment to the beneficiary, the bank is obliged to pay interest to either the originator or the beneficiary of the funds transfer for the period of delay caused by the improper execution. Except as provided in subsection (c), additional damages are not recoverable.

> (b) If execution of a payment order by a receiving bank in breach of Section 4A-302 results in (I) noncompletion of the funds transfer, (ii) failure to use an intermediary bank designated by the originator, or (iii) issuance of a payment

order that does not comply with the terms of the payment order of the originator, the bank is liable to the originator for its expenses in the funds transfer and for incidental expenses and interest losses, to the extent not covered by subsection (a), resulting from the improper execution. Except as provided in subsection (c), additional damages are not recoverable.

(c)   In addition to the amounts payable under subsections (a) and (b), damages, including consequential damages, are recoverable to the extent provided in an express written agreement of the receiving bank.

## B.  The CMA

One of the documents executed by the parties as part of the CMA was the Funds Transfer Services Rider ('the FTS Rider").  (Ex. W-38, WSFS 01535-01545).  Section 2 of the FTS Rider listed eight (8) services regarding payment orders to be paid through the cash management system.  All of the services were worded in terms of "may" as opposed to shall.  For instance, in the execution of payment orders, WSFS may execute each order received by it in the name of UDI as sender, provided that UDI had sufficient available funds on deposit in an account.  (See Id., WSFS 01535, FTS Rider ¶ 2.1).  The FTS Rider also provided that WSFS may reject any order that does not comply with the Services Agreement or funds transfer rules and security procedures.  (Id., WSFS 01535-01536, FTS Rider ¶ 2.2).

The FTS Rider described the notice required if a payment order was not executed.  If WSFS rejected or failed to execute an order of UDI, then WSFS was obligated to give notice to UDI by no later than the close of business on the execution date of the order.  (Id.).

Section 3 of the FTS Rider defined the fees, compensation, and costs associated for the services.  The FTS Rider allowed WSFS to directly debit any of UDI's accounts without prior notice for any fees, charge-backs, return fees for checks, drafts, payment orders or other payments owing to WSFS.  (Id., WSFS 01537-01538, FTS Rider ¶ 3.1).

WSFS was required to pay UDI if it rejected or failed to execute an order if, on the

execution date of the order, there was a sufficient available balance in UDI's account to pay for

the order. (Id., WSFS 01538, FTS Rider ¶ 3.3). WSFS also was required to compensate UDI for

the use of funds at the rate specified in ¶ 3.1.


### C. Discussion

In Count Three, the Trustee claims that WSFS intentionally failed to execute the First and

Second TD Bank Transfer Orders with the intent of taking the funds for its own benefit, (Second

Am. Compl. ¶¶ 115, 118), giving rise to a claim under 6 Del. C. §4A-305.[45]

WSFS raises several grounds for the entry of summary judgment in its favor on Count

Three. First, WSFS argues that due to UDI's material contract breach, WSFS had no obligation

to execute the orders under the CMA, and therefore no liability under §4A-305. (WSFS Mem. at

86). Second, WSFS contends that there is no dispute that WSFS actually executed the orders,

but then reversed them. (Id. at 87). Lastly, WSFS argues that the FTS Rider gave WSFS

discretion to execute the orders and UDI did not have sufficient collected available funds as

required. (Id. at 86-87). WSFS' second argument provides the rule of decision on Count Three.

The undisputed facts establish that WSFS executed the First and Second TD Bank

---

[45]    The Trustee requested "consequential damages, compensatory damages, direct and
indirect damages, punitive damages, setoff, recoupment, credits, interest, costs of suit, attorneys' fees and
legal expenses, and for such other and further relief that the Court deems just, proper, and equitable" for
WSFS's failure to execute the First and Second TD Bank Transfer Orders. (Second Am. Compl.
"wherefore clause," at 24). However, the Trustee's request for consequential damages was dismissed for
purposes of trial by the Order entered June 15, 2012 (Adv. No. 11-512, Doc. # 43), and the Trustee did
not seek leave to amend Count Three in its Motion to Amend the First Amended Complaint. Thus, the
Trustee's request for damages under Count Three is limited to "expenses in the transaction and for
incidental expenses and interest losses resulting from the failure to execute." (Id.).

Transfer Orders.  TD Bank, the beneficiary bank in this transaction, accepted the orders and credited UMI's account at TD Bank.  The funds transfer was completed.

It is also undisputed that WSFS requested TD Bank to return the First and Second TD Bank Transfer Orders.  TD Bank honored WSFS' request that the First TD Bank Transfer Order be reversed, but refused the request as to the Second Transfer Order.

The Trustee's claim fails because once a payment order is accepted it may not be rejected. By definition, neither Transfer Order was rejected.

Article 4A allows recovery under certain narrow circumstances.  This fact situation before me does not fit the provisions of the statute.  Further, a review of the case law, reveals no decision on point to support the Trustee's legal theory.  Therefore, the Trustee may not recover under Article 4A for a post-completion revocation of a completed payment order.

To the extent the Trustee complains about the revocation of the Second TD Bank Transfer Order, there is no remedy under Article 4A.  I do not decide whether another provision of the U.C.C. provides a remedy or whether the transaction might state a cause of action under another area of state law.  The Trustee has not raised an alternative cause of action.

Summary judgment should be entered in favor of WSFS and against the Trustee on Count Three of the Second Amended Complaint.


# VII. WSFS IS ENTITLED TO SUMMARY JUDGMENT ON THE TRUSTEE'S FRAUDULENT TRANSFER CLAIMS (COUNTS SIX AND SEVEN)


### A.  The Trustee's Claims Are Based Solely on Constructive Fraud

In Count Six and Seven, the Trustee asserts claims for fraudulent transfers pursuant to 11

U.S.C. §§544 and 548.  Although the Trustee recites the "actual intent" provisions of 6 Del. C.

§§1304(a)(1) (for purposes of §544) and 11 U.S.C. §548(a)(1)(A),[46] he has not presented any

argument or evidence in support of a claim for intentional fraud.  In these circumstances, I do not

consider the Trustee to be pressing any claim that UMI, UDI or WSFS participated in any

scheme that was intentionally designed to hinder, delay or defraud creditors.  Therefore, I limit

my analysis of Counts Six and Seven to the Trustee' constructive fraud claim.


### B.  Summary of the Parties' Positions

The transfers at issue are the following: (1) the initial UMI-UDI Transfers and (2) the

Setoff (i.e., UDI's involuntary transfer to WSFS that paid off the Loan).  Collectively, I will refer

them as the "Transfers."

The Trustee offers two (2) legal theories that the Transfers were constructively fraudulent.

First, the Trustee argues that the UMI-UDI Transfers went directly to WSFS.  The

Trustee contends that WSFS was the "initial transferee" because it exercised dominion and

control over UDI's depository accounts by placing the PND restriction on UDI's accounts before

taking the funds for its own benefit – even though the UMI-UDI Transfers were deposited

initially into UDI's account before WSFS moved the money to the general ledger account and

subsequently satisfied the Loan.  (Tr. Mem. at 78).  The Trustee further emphasizes that WSFS

controlled the disposition of other monies in the UDI Accounts, including reversing and

returning items previously attempted to be paid out by UDI (i.e., the Second TD Bank Transfer).

---

[46]      The Trustee cited the "actual intent" provisions in both the Second Amended Complaint
and his motion for summary judgment.

(Tr. Mem. at 79).  Under this initial transferee theory, the Trustee asserts that he may recover the

Transfers because there was no consideration for the Transfers.  There was no consideration

because UMI owed no money to WSFS and WSFS provided no value to UMI (which was

insolvent at the time) in return for the $5 million that it received.

The Trustee's alternative legal theory is that he may recover the Transfers from WSFS as

a subsequent transferee.  The basis for this position is quite conventional.  He contends that UMI

did not receive reasonably equivalent value for the transfers it made to UDI.

WSFS disputes every aspect of the Trustee's theory.  As a threshold issue, WSFS argues

that the Trustee has not identified the Transfers with specificity.  Next, WSFS contends that not

only was UDI the initial transferee, but also there was value supporting both the inbound

transfers from UMI to UDI and the subsequent outbound transfers from UDI to WSFS (the

consideration in the second transfer being repayment of an antecedent debt).  Finally, WSFS

contends that the Transfers made in satisfaction of UDI's outstanding debt (i.e., the Loan) were

in good faith and without knowledge of their avoidability.  See 11 U.S.C. §550(b)(1).

### C.  Constructive Fraud: Applicable Legal Principles

#### 1.  11 U.S.C. §548

For a constructive fraud claim, 11 U.S.C. §548(a) provides:

> (a)(1)  The trustee may avoid any transfer... of an interest of the debtor in
> property . . . that was made . . . within 2 years before the date of the filing
> of the petition, if the debtor voluntarily or involuntarily—
>
> * * *
>
> (B)  (I)  received less than a reasonably equivalent value in
>             exchange for such transfer or obligation; and

(ii) (I)    was insolvent on the date that such transfer was made
or such obligation was incurred, or became insolvent
as a result of such transfer or obligation;

(II)   was engaged in business or a transaction, or was
about to engage in business or a transaction, for which
any property remaining with the debtor was an
unreasonably small capital;

(III)  intended to incur, or believed that the debtor would
incur, debts that would be beyond the debtor's ability
to pay as such debts matured; or

(IV)   made such transfer to or for the benefit of an insider,
or incurred such obligation to or for the benefit of
an insider, under an employment contract and not in the
ordinary course of business.

In most proceedings, this constructive fraudulent transfer statutory verbiage can be

distilled down to four (4) elements:

(1) the debtor had an interest in the property;

(2) the interest was transferred within two years of the filing of his bankruptcy
petition;

(3) the debtor received less than equivalent value in exchange for the transfer; and

(4) either:

(I)    the debtor was insolvent at the time of the transfer; or

(ii)   became insolvent as a result thereof; or

(iii)  intended to incur, or believed that he would incur, debts that would
be beyond his ability to pay them as they became matured.

See, e.g., In re Dawley, 2005 WL 2077074, at *14 (Bankr. E.D. Pa. Aug. 10, 2005).

The party challenging the transfer bears the burden of proving all of the elements of a

constructive fraudulent transfer claim.  See, e.g., In re Fruehauf Trailer Corp., 444 F.3d 203, 211

(3d Cir. 2006); In re Plassein Int'l Corp., 405 B.R. 402, 411 (Bankr. D. Del. 2009), aff'd, 428

B.R. 64 (D. Del. 2010).

Frequently in §548(a)(1)(B) litigation, the most heavily litigated issue is the third

element: whether the debtor received reasonably equivalent value in the transaction.  In this

Circuit, courts employ a two (2) step process in determining whether a debtor received

reasonably equivalent value in the form of indirect economic benefits in a particular transaction:

> (1) whether any value is received, and

> (2) whether that value was reasonably equivalent to the transfer made.

In re R.M.L., 92 F.3d 139, 152 (3d Cir. 1996); Plassein Int'l Corp., 405 B.R. at 411; see also In

re Fid. Bond & Mortg. Co., 340 B.R. 266, 287 (Bankr. E.D. Pa. 2006), aff'd, 371 B.R. 708 (E.D.

Pa. 2007).  Because the purpose of the fraudulent transfer statute is to protect creditors, the court

determines whether value was received from the vantage of the creditor.  Fid. Bond & Mortg.,

340 B.R. at 286.  The inquiry is "what did the debtor give up and what did it receive that could

benefit creditors."  Id. (citing In re Joy Recovery Tech. Corp., 286 B.R. 54, 75 (Bankr. N.D. Ill.

2002)).

In this determination, "value . . .  include[s] any benefit . . . whether direct or indirect."

Fruehauf Trailer Corp., 444 F.3d at 212 (citation omitted); Mellon Bank, N.A. v. Metro

Communications, Inc., 945 F.2d 635, 646-47 (3d Cir. 1991); In re Vaso Active Pharm., Inc.,

2012 WL 4793241 (Bankr. D. Del, Oct. 9, 2012).  The "touchstone" in the determination is

whether the parties exchanged comparable "realizable commercial value."  Mellon Bank, 945

F.2d at 647.  Thus, if a debtor's "realizable going concern value after the transaction is equal to

or exceeds its going concern value before the transaction, reasonably equivalent value has been

received." Id.

In the reasonably equivalent value inquiry, courts look to the totality of the circumstances, considering such factors as "(1) whether the transaction was at arm's length, (2) whether the transferee acted in good faith, and (3) the degree of difference between the fair market value of the assets transferred and the price paid." Plassein Int'l Corp., 405 B.R. at 411; accord Fid. Bond & Mortg., 340 B.R. at 287 (citing R.M.L., 92 F.3d at 145, 153). If a court concludes that the benefits the debtor received "are minimal and certainly not equivalent to the value of a substantial outlay of assets," a plaintiff need not prove the exact value conferred because the "amount" of value is then irrelevant. Fruehauf Trailer Corp., 444 F.3d at 214.

### 2. 11 U.S.C. §544(b) and 6 Del. C. §§1304, 1305

11 U.S.C. §544(b)(1) provides that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502. . . ." Section 544(b) allows the Trustee to step into the shoes of an actual creditor who existed at the commencement of the bankruptcy case, and avoid the fraudulent transfers pursuant to state law.

The Trustee invokes 6 Del. C. §§1304 and 1305 of the Delaware fraudulent transfer statute as applicable state law under §544(b).

6 Del. C. §1304  provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

* * *

(2) Without receiving a reasonably equivalent value in exchange for the
transfer or obligation, and the debtor:

    a.  Was engaged or was about to engage in a business or a
transaction for which the remaining assets of the debtor were
unreasonably small in relation to the business or transaction; or

    b.  Intended to incur, or believed or reasonably should have
believed that the debtor would incur, debts beyond the debtor's
ability to pay as they became due.

6 Del. C. §1305 provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor
whose claim arose before the transfer was made or the obligation was incurred
if the debtor made the transfer or incurred the obligation without receiving a
reasonably equivalent value in exchange for the transfer or obligation and the
debtor was insolvent at that time or the debtor became insolvent as a result of
the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose
before the transfer was made if the transfer was made to an insider for an
antecedent debt, the debtor was insolvent at that time and the insider had
reasonable cause to believe that the debtor was insolvent.

In order to prevail under the Delaware constructive fraud transfer provisions, the Trustee

must establish that:

(1) the debtor made a transfer;

(2) for less than reasonably equivalent value; and

(3) the debtor was, or was rendered, insolvent thereby.

In re Delta Petroleum Corp., 2015 WL 1577990, *18 (Bankr. D. Del. Apr. 2, 2015) (citing Brandt

v. Trivest II, Inc. (In re Plassein Int'l Corp.), 2008 WL 1990315, *5 (Bankr. D. Del. May 5,

2008)).

### D.  WSFS Was Not an "Initial Transferee" of the UMI Transfers

The Trustee's lead theory hinges on the notion that WSFS was the initial transferee (i.e., the direct recipient) of the UMI-UDI Transfers.

Significantly, the concept of an "initial transferee" does not derive from the avoidance sections of the Bankruptcy Code.  Rather, it is derived from 11 U.S.C. §550, the Code provision that addresses a trustee's ability to recover property after establishing that a transfer is avoidable. Section 550 of the Code provides, in pertinent part:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553 (b), or 724 (a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from —
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) an immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

Section 550(a) does not define the term "initial transferee," however.  In the absence of a clear statutory definition, courts have developed standards for determining whether a party is an "initial transferee."

### 1.  The Bonded Financial Services and Incomnet Tests

 Most courts, including a number of circuit courts of appeal, have concluded that mere initial receipt of a transfer does not always equate to initial transferee status.  See 4 Norton Bankr. L. & Prac. 3d §70:2 (West 2015).

In Bonded Fin Servs. v. Europen Am. Bank., 838 F.2d 890, 893 (7th Cir. 1988) (emphasis

added), the court explained:

> Although the Bankruptcy Code does not define "transferee," and there is no legislative history on the point, we think the minimum requirement of status as a "transferee" is **dominion over the money or other asset, the right to put the money to one's own purposes**.

The standard articulated in Bonded is known as the "dominion-and-control test," and has been widely adopted.  See In re Hurtadou, 342 F.3d 528, 533 (6th Cir. 2003) (following In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 130 F.3d 52, 57 (2d Cir. 1997)).[47]

In In re Incomnet, Inc., 463 F.3d 1064 (9th Cir. 2006), the Ninth Circuit articulated a distinction between "dominion" and "control."  The focus of the dominion standard is "whether an entity had legal authority over the money and the right to use the money however it wished." Id. at 1070.  The transferee has dominion if it has "the right to put the money to one's own purposes."  Id. (internal quotations and citation omitted).  In contrast, the "control" standard may involve a broader, more flexible approach, in which the courts look at the entire transaction as a whole to evaluate which party truly had control of the money.  Id.

The Incomnet court described the two (2) tests as "similar, [but] not indistinguishable." Id. at 1071.  The dominion test focuses on legal title and the transferee's right to use the funds as it sees fit; the control test "takes a more gestalt view of the entire transaction to determine who

---

[47]    The concept that the record recipient of a transfer may not be the initial transferee also finds expression in the related "conduit theory" doctrine.  An entity that receives a transfer may not be a "transferee" at all, but only a "mere conduit" if the transfer is for the limited purpose of allowing the entity to pass the asset through to another party.  "The key characteristic of a conduit is that the person or entity is under a contractual or other obligation to use the transferred funds or assets for the benefit of a third party and may not put those funds or assets to its own use."  Polichuk, 506 B.R. at 450.

. . . controlled the funds in question." Id.[48]

After articulating the distinction between "dominion" and "control," the Incomnet court

clarified that, in prior cases, the Ninth Circuit had adopted the dominion test to the exclusion of

the control test.  Id. at 1071 (citing In re Cohen, 300 F.3d 1097, 1102 n.2 (9th Cir. 2002)); see also

In re Mortgage Store, Inc., 773 F.3d 990, 996 (9th Cir. 2014) (reaffirming the "dominion" test

articulated by Incomnet).

The Third Circuit has not adopted any specific test.  The parties differ as to the proper test

the court should employ to evaluate this issue.

The Trustee argues that this court should employ the combined "dominion and control

test," set forth in Bonded Financial and focus on the transferee's relationship to the property.

(Tr. Mem. at 74 (citing Perrino v. Salem, Inc., 243 B.R. 550, 561 (D. Me. 1999)).  In other

words, in the case of funds held in an account, the Trustee urges the court to determine the terms

under which the funds are held and to ascertain the debtor's interest in said funds.  "Funds may

---

[48]     The Incomnet court also observed that "[a] number of circuits combined these tests—or
at least combined their names— creating a 'dominion and control test' to determine whether a party is an
initial transferee."  463 F.3d at 1071.

In a slight variation, the Eleventh Circuit applies the "conduit or control" test as an
"equitable exception" to the literal or rigid interpretation of the statutory term "initial transferee," most
commonly thought of as the first recipient of fraudulently-transferred funds.  In re Harwell, 628 F.3d
1312, 1322 (11th Cir. 2010).  In Harwell, the circuit court added "good faith" as an element of the
equitable exception:

> [I]nitial recipients of the debtor's fraudulently-transferred funds who seek to take
> advantage of equitable exceptions to §550(a)(1)'s statutory language must
> establish (1) that they did not have control over the assets received, i.e., that they
> merely served as a conduit for the assets that were under the actual control of the
> debtor-transferor and (2) that they acted in good faith and as an innocent
> participant to the fraudulent transfer.

Id.

not be the property of the party in whose account such funds reside, if such depositor's use of those funds is so restricted that he cannot control their use or disposition." (Tr. Mem. at 74-75 (citing In re Bank of New Eng., 165 B.R. 972, 977 (Bankr. D. Mass. 1994))).

WSFS views both the facts and the law differently.  WSFS recommends application of the "dominion" test, as set forth by Incomnet.  WSFS argues that it never exercised dominion over the transfers from UMI (and, thus, cannot be an initial transferee) because it had no legal right to use those funds.  WSFS describes the PND restriction as merely  "a privileged cautionary measure [that] limited [WSFS'] discretionary provision of credit to UDI under the Cash Management Services Agreement."  (WSFS Mem. at 119; Doc. # 206).  Citing to Citizens Bank of Maryland v. Strumpf, 516 U.S. 16 (1994), WSFS claims that such an act of temporary suspension is not an act of dominion.  (WSFS Mem. at 120).  "Suspension is not even denial of any level of control of the funds, since WSFS's obligations to UDI were not denied – merely frozen to protect them from the automatic debits in the electronic funds transfer system."  (Id.). As to the $5 million applied to satisfy UDI's loan, WSFS characterizes this as a subsequent transaction; simply a transfer from the UDI deposit account to a ledger account, with WSFS's $5 million obligation to UDI as a deposit customer remaining intact.  Accordingly, WSFS argues that UDI was the initial transferee when it received the funds from UMI, and took title and dominion over them.  Only after UDI had dominion over those funds, did WSFS exercise its right to apply the funds to UDI's Loan indebtedness.  Thus, according to WSFS, WSFS was only a subsequent transferee of the UMI-UDI Transfer, not the initial transferee from UMI.

## 2.  WSFS was not the initial transferee
### because it lacked dominion or control over the UDI accounts

Based on my review of the record, I agree with WSFS and conclude that the undisputed

facts establish that WSFS lacked dominion or control over the UDI accounts sufficient to

establish that WSFS was an initial transferee under §550(a).  Contrary to the picture drawn by the

Trustee, the measures taken by WSFS between July 16 through July 19, 2009 did not absolutely

restrict all outgoing transfers from UDI's account.

Most significantly, there is no evidence of any legal title change to the funds in UDI's

accounts.  Nor is there any indication that UDI was utterly helpless and without access to funds.

As detailed in Part V.B., supra, for the few days the PND was in effect, WSFS continued to

honor requests for transfers and otherwise made funds available to UDI.  The PND merely

suspended the funding of outgoing transfers with provisional or advance credit without review.

Therefore, I conclude that WSFS did not have the requisite dominion or control over

UDI's accounts to render it an "initial transferee" of the UMI-UDI Transfers.  WSFS was a

subsequent transferee.


## E.  WSFS Is Not Liable as a Subsequent Transferee
### of the UMI-UDI Transfer

Having determined that WSFS was a subsequent transferee of the UMI-UDI Transfers, I

now must evaluate the corollary issue: whether, as a result of the Setoff,  WSFS was the recipient

of a fraudulent transfer as a subsequent transferee.

In this scenario, the Trustee must establish that UMI did not receive reasonably

equivalent value **for the transfers UMI made to UDI** and that WSFS is liable as a subsequent

transferee.  See 11 U.S.C. §§548(a)(1)(B) and 550(a)(2).  For the following reasons, I find the Trustee has not met his burden his burden of proof.

The Trustee argues that UMI received no value for the transfers they made to UDI because UMI provided goods and services to UDI – i.e., there was no reason for UMI to transfer money to UDI.  (Tr.. at 68, n.27; Tr. Reply at 30-31).  The Trustee posits that the funds should have flowed the other direction, i.e., from UDI to UMI.  (Tr. Mem. at 68, n.27).  As WSFS points out, however, it was the Trustee's burden to produce evidence demonstrating the lack of reasonably equivalent value.  The Trustee has failed to submit any evidence other than his supposition that UDI did not provide value to UMI.

Moreover, in pressing for summary judgment, WSFS has not relied solely on the shortfall in the Trustee's case.  WSFS also offered evidence that the Transfers were made in exchange for value.  WSFS documented $1.7 million of UDI credit card sale receivables that UMI collected during July 2009 and owed to UDI.  Further value to UMI and UEI was provided in the form of liquidity obtained through the cash management services WSFS provided to UDI.  (WSFS Reply at 28).  WSFS also offered evidence that UMI owed an obligation to UDI on account of receivables it was collecting on UDI's behalf.   (See Ex. 76, Bohnert Dep. at 185-86).

The Trustee has not quantified the inadequacy of any value UDI received from UMI, as is his burden.  The only evidence in the summary judgment record is that the UMI-UDI Transfers were supported by some value.  Thus, the Trustee lacks evidentiary support for a necessary element of his claim.  In these circumstances, WSFS is entitled to summary judgment on this claim.  See Polichuk, 506 B.R. at 423 ("the appropriate time for demonstrating that there is evidence that supports every element of .  .  .   the Trustee's claims (in response to the

-68-

contention that no such evidence exists) is now, at summary judgment") (internal quotations

omitted).

## VIII.   WSFS IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE TRUSTEE'S SETOFF CLAIM UNDER 11 U.S.C. §553(b) (COUNT EIGHT)

### A.   The Trustee's §553(b) Claim is Dependent on the <u>Nunc Pro Tunc</u> Extension of Substantive Consolidation to WSFS

In Count Eight, the Trustee invokes 11 U.S.C. §§553(b) and 550 and seeks to avoid

WSFS' $5 million Setoff against UDI's bank accounts.

Section §553(b) provides:

> (b)(1)   Except with respect to a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, 561, 365(h), 546(h), or 365(i)(2) of this title, if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of–
>
> > (A)   90 days before the date of the filing of the petition; and
> >
> > (B)   the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.
>
> (2)   In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.

11 U.S.C. §553(b).

Section 553 allows a trustee to avoid the amount of its improvement in position within 90

days of the petition date.  The mechanics of determining whether a creditor improved its position

by setoff during the 90 day period is as follows:

> [W]here a setoff occurred within 90 days before the commencement of
> bankruptcy, the trustee  .  .  .  may recover the amount of setoff to the extent of a
> reduction of the insufficiency within a certain time frame. "Insufficiency" is
> defined at §553(b)(2) as the amount by which a claim against a debtor exceeds a
> mutual debt owing to the debtor by the holder of such claim. Under § 553(b), the
> amount [of] the setoff [that] may be recovered is determined by comparing the
> insufficiency in existence 90 days before the filing (or, if later, the first date on
> which there was an insufficiency) with the insufficiency on the date of setoff.  The
> trustee  .  .  .  is entitled to recover the amount by which the former amount
> exceeds the latter.

In re Aspen Data Graphics, Inc., 109 B.R. 677, 684 (Bankr. E.D. Pa. 1990) (citations omitted).

Ninety (90) days prior to the setoff, the Trustee contends that there was an "insufficiency"
in excess of $5.75 million.  (Second Am. Compl. ¶ 218).  On the day that WSFS setoff the Loan,
there was no insufficiency; the setoff paid off the indebtedness.

The Trustee's §553(b) claim is dependent upon achieving substantive consolidation of
UDI's estate with the existing bankruptcy estate **as to WSFS**.  As explained in Part III.A., supra,
the court's order substantively consolidating UMI and UDI provided that the order would **not**
"impact any rights concerning WSFS," thereby excepting WSFS from its effects.  As to WSFS,
the order provided that UDI would be treated as having filed a bankruptcy petition on August 4,
2010 in a case jointly administered (but not substantively consolidated) with UMI's bankruptcy
case.

If August 4, 2010 is employed as the petition date, the Trustee's claim is doomed because
WSFS' July 2009 setoff occurred far outside the ninety (90) day look back period of 11 U.S.C.
§553(b)(1)(A).  Hence, in this adversary proceeding, the Trustee invokes the right reserved in the
August 4, 2010 substantive consolidation order to seek extension of substantive consolidation to
WSFS effective July 23, 2009 (the date UMI filed its bankruptcy petition).  If UDI is treated as

having filed a bankruptcy petition on July 23, 2009, the Trustee can satisfy the temporal ninety

(90) day requirement in §553(b).

In their memoranda, the parties sparred on the threshold issue whether, as a matter of law,

the Trustee may even seek substantive consolidation as to WSFS.

WSFS argues that the Trustee may not wield substantive consolidation offensively, i.e.,

as a stratagem to create a §553(b) claim against WSFS.  (WSFS Mem. at 88).  WSFS relies on

Owens Corning, 419 F.3d 195 (3d Cir. 2005), and asserts that substantive consolidation cannot

be used to create causes of action to the detriment of creditors or to alter creditors' rights.  WSFS

also makes a more fact-specific based argument that it is being "singled out" by the Trustee and

that such use of  substantive consolidation is inappropriate and impermissible.

The Trustee responds that he is not singling out WSFS.  The Trustee states that one

aspect of the goal of substantive consolidation is to allow the estate to bring actions on behalf of

the consolidated estates in order to bring assets back into the estate and for the benefit all

creditors.  The Trustee asserts that, from the outset, he sought substantive consolidation to create

avoidance actions and raise an estate with the consolidated entities and that he merely deferred

resolution of the issue as to WSFS.

On this threshold issue, the Trustee is correct.


### B.  Substantive Consolidation: General Legal Principles

Substantive consolidation is an equitable remedy.  "It treats separate legal entities as if

they were merged into a single survivor left with all the cumulative assets and liabilities (save for

inter-entity liabilities, which are erased)."  Owens Corning, 419 F.3d at 205 (quoting In re

Genesis Health Ventures, Inc., 402 F.3d 416, 423 (3d Cir. 2005)).  The Third Circuit has

described substantive consolidation as an "extreme" and "last-resort remedy" that "rais[es] the

specter for some [creditors] of a significant distribution diminution."  Owens Corning, 419 F.3d

at 206.

Owens Corning created a black letter law test for substantive consolidation in which the

proponent must prove: "(i) prepetition [the entities to be consolidated] disregarded separateness

so significantly their creditors relied on the breakdown of entity borders and treated them as one

legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is

prohibitive and hurts all creditors."  Id. at 211 (footnotes omitted).

The black letter law test is stated in general terms, leaving much to the exercise of the

bankruptcy court's discretion.  The Owens court sought to guide the bankruptcy court by stating

the following limiting principles to be considered when a party seeks substantive consolidation:

> (1) Absent compelling circumstances, state law, the Bankruptcy Code and
> commercial markets legitimately expect courts to respect the separateness of
> separate entities.
>
> (2) The harms that substantive consolidation addresses are nearly always those
> caused by debtors who disregard separateness.
>
> (3) Mere benefit to the administration of the case is not a harm that justifies
> substantive consolidation.
>
> (4) Substantive consolidation is extreme and imprecise – this rough justice should
> be rare and used as a last resort.
>
> (5) "While substantive consolidation may be used defensively to remedy the
> identifiable harms caused by entangled affairs, it may not be used offensively
> (for example, having a primary purpose to disadvantage tactically a group of
> creditors in the plan process or to alter creditor rights)."

Owens Corning, 419 F.3d at 211.

It is the fifth legal principle quoted above that is the foundation of WSFS' argument that extending substantive consolidation to it, at this time, is inappropriate.  Respectfully, I disagree that the fifth legal principle controls the outcome here.

### C.  __Owens Corning__ Does Not Bar, As a Matter of Law, the __Nunc Pro Tunc__ Extension of Substantive Consolidation to WSFS

WSFS argues that I should consider the propriety of extending the substantive consolidation from the vantage point of July 18, 2011, the date the Trustee filed this adversary proceeding.  Certainly, as of that date, WSFS can make a strong case that the Trustee's request for substantive consolidation appears inconsistent with Owens Corning.  It has the appearance of a litigation tool targeting a single creditor, rather than as a remedy designed to do equity among numerous parties.  However, this argument fails to take into account the prior procedural history of this case.

The Trustee's original motion for substantive consolidation encompassed WSFS.  In the consolidation motion, the Trustee represented that a significant magnitude of inter-company transfers among the Affiliates occurred on a daily basis; assets of the companies were commingled; business records could not be reconciled without substantial expense; and certain large creditors relied upon the overall financial position of UMI effectively as a single entity. The factual circumstances alleged by the Trustee provided a facially plausible justification for substantive consolidation under Owens Corning.

Further, from the outset, the Trustee sought nunc pro tunc consolidation as a means to preserve claims under chapter 5 of the Bankruptcy Code.  The Trustee represented that the chapter 5 claims "would otherwise be unavailable as a potential avenue of recovery by the

creditor body of the Universal Network" and that preservation alone "would clearly provide

significant benefit to the creditors of the consolidated Universal Network entities." (Goldstein

Declaration ¶ 15; Bky No. 09-15404, Doc. # 318). The Trustee was not seeking to isolate an

individual creditor or a discreet group for disparate treatment; instead, he was suggesting that the

universe of transfer avoidance claims was a tool that should be available for the equitable

administration of this chapter 7 case.[49]

Against this backdrop, no creditor objected to the Trustee's substantive consolidation

request except WSFS. The Trustee and WSFS then struck the bargain described earlier in this

Opinion, in which substantive consolidation was effected (except for WSFS), UDI was deemed a

jointly administered chapter 7 debtor as to WSFS as of August 4, 2010, and the parties reserved

all of their respective rights to seek or contest further substantive consolidation.[50] Presumably,

the Trustee desired more time to investigate and weigh his options before embarking on what

promised to be (and turned out to be) hotly contested, expensive litigation against WSFS. For its

part, WSFS presumably hoped to avoid expending further resources litigating substantive

---

[49]    WSFS disputes this, pointing to the Trustee's deposition, in which he stated that
substantive consolidation was beneficial to the bankruptcy estate because it provided a means of bringing
the §553 claim against WSFS. (WSFS Mem. at 90). In the deposition, the Trustee could cite to no other
ground for extending substantive consolidation to include UDI nunc pro tunc to UMI's petition date of
July 23, 2009.

        The Trustee's deposition testimony provides little support to WSFS. The testimony
merely reflects the state of affairs existing **after** substantive consolidation already had been applied to the
creditors other than WSFS.

[50]    In Owens Corning, the Third Circuit left open the question whether a creditor may carve
itself out of the effects of substantive consolidation. See, 419 F.3d at 210 n.16, 212 n.22 (discussing
possibility of partial consolidation). Right or wrong, that is what occurred in this case, subject to the
parties' agreement that the Trustee retained the right to expand the partial consolidation to encompass
WSFS.

consolidation issues that would be merely academic (as to WSFS) if the Trustee decided against filing adversary litigation against WSFS.

In effect, the parties' agreed to defer the substantive consolidation dispute through a "standstill agreement." To give effect to the parties' agreement, it is necessary to treat this litigation as resuming the dispute when they declared a truce in August 2010. It follows that the issue should be considered as if no substantive consolidation had occurred as to any of the non-UMI entities. Thus, if the Trustee can make out the case now that would have allowed him to obtain substantive consolidation over WSFS' objection as to all creditors (in 2010), he should be permitted to do so. To conclude otherwise would mean that, by obtaining substantive consolidation except as to WSFS in 2010, the Trustee did not preserve, but rather effectively waived, his right to later seek extension of substantive consolidation retroactive to July 23, 2009 as to WSFS. The parties' agreement, as incorporated in the August 4, 2010 substantive consolidation order, is to the contrary.

In these circumstances, the parties' agreement and fairness dictate that I now consider the extension of nunc pro tunc substantive consolidation to WSFS from the pre-substantive consolidation temporal vantage point of August 4, 2010. Accord In re Lower Bucks Hospital, 471 B.R. 419, 450 (Bankr. E.D. Pa. 2012), aff'd, 488 B.R. 303 (E.D. Pa. 2013), aff'd, 571 F. App'x 139 (3d Cir. 2014) (parties bound by agreement to allow chapter 11 plan to be confirmed and defer litigation of propriety and court approval of discreet plan provision without prejudice to their rights). It follows that WSFS' argument that the extension of substantive consolidation constitutes an inappropriate "offensive" use of the doctrine is unpersuasive.

In sum, based on the particular circumstances of this case, I conclude that: (1) the

Trustee's request for <u>nunc pro tunc</u> extension of substantive consolidation as to WSFS should be considered on its merits, and (2) therefore, the Trustee's setoff claim is not barred as a matter of law for failure to satisfy the ninety (90) day look back requirement of 11 U.S.C. §553(b)(1)(A).

### D.  The Setoff Claim is Not Ripe for Summary Judgment

Other than debating the issue whether an attempted "offensive" use of substantive consolidation to create an avoidance claim against a single creditor barred its applicability in this case as a matter of law (thereby defeating the Trustee's §553(b) setoff claim), neither party discussed or marshaled the evidence generated in discovery on the questions whether the Trustee has or lacks evidence to support (1) substantive consolidation under <u>Owens Corning</u> and (2) the elements of a setoff claim under §553(b)  – in particular, whether the "insufficiency" decreased during the ninety (90) day period prior to the bankruptcy filing.  In these circumstances, summary judgment on the Trustee's setoff claim should not be granted because there are disputed issues of material fact.

## IX.  MANNER OF DISPOSITION OF THE MOTIONS

For the reasons explained below, I cannot enter a final, dispositive order granting summary judgment to WSFS on Counts One, Two, Three, Six and Seven.

### A.  Jurisdictional Overview

As stated in numerous reported opinions, bankruptcy subject matter jurisdiction is conferred by 28 U.S.C. §1334(a) and (b) potentially extends to four (4) types of title 11 matters:

(1) cases under title 11;

(2) proceedings arising under title 11;

(3) proceedings arising in a case under title 11; and

(4) proceedings related to a case under title 11.

See, e.g., In re Combustion Engineering, Inc., 391 F.3d 190, 225-26 (3d Cir. 2004).  This

jurisdiction is vested in the district court, but the district court has the authority to refer

bankruptcy cases and proceedings to the bankruptcy court.  28 U.S.C. §157(a).  In this district,

the district court has done so.  See Standing Orders of the District Court dated July 25, 1984 and

November 8, 1990.

According to the text of the Judicial Code, all bankruptcy matters, other than the

bankruptcy case itself, may be classified into two (2) categories:

(1) core proceedings arising under title 11; and

(2) non-core proceedings that are otherwise related to a case under title 11.

See 28 U.S.C. § 157(b), (c); In re Mullarkey, 536 F.3d 215, 221 (3d Cir. 2008).

The core/non-core distinction is significant because "[a] correct determination of whether

a matter is core or non-core establishes the bankruptcy judge's level of authority."  In re Seven

Fields Dev. Corp., 505 F.3d 237, 254 (3d Cir. 2007).  The bankruptcy court has the statutory

authority to determine all core matters.  11 U.S.C. §157(b)(1); see generally In re Porter, 295

B.R. 529, 535 (Bankr. E.D. Pa. 2003).  In a non-core proceeding, the bankruptcy court may not

enter a final judgment, but may only submit proposed findings of fact and conclusions of law to

the district court for de novo review, unless all parties agree that a final judgment may be entered

by the bankruptcy court.  See 28 U.S.C. §157(c); Halper v. Halper, 164 F.3d 830, 836 (3d Cir.

1999).

In 2011, the Supreme Court's decision in <u>Stern v. Marshall</u>, created a third category of

matters in the universe governing the division of authority between the district court and the

bankruptcy court.  In <u>Stern</u>, the Supreme Court held that Article III of the U.S. Constitution

prohibits bankruptcy courts from issuing final orders in certain matters Congress classified as

core in 28 U.S.C. §157(b).  Such claims (commonly referred to as "<u>Stern</u>" claims) are now

treated in most, if not all, respects as non-core.  <u>See</u> <u>Wellness Int'l Network</u>, 135 S. Ct. 1932.

Thus, to determine the scope of its decision-making authority, the bankruptcy court must

now undertake a two-step process.  First, as it did prior to <u>Stern</u>, it must ascertain whether 28

U.S.C. §157(b) designates a particular claim as core or non-core.  Second, if the court determines

the claim to be core (statutorily speaking), the court then must consider whether the claim is a

<u>Stern</u> claim.

In this case, the Trustee has asserted that all of his claims are core.  (Second Am. Compl.

¶ 3, Adv. No. 11-512, Doc. # 170).  WSFS disputes this.  (Answer to Second Am. Compl. ¶ 3,

Adv. No. 11-512, Doc. # 176).

### B.  All of the Claims to Be Dismissed are Either Non-Core or <u>Stern</u> Claims

The concept of a core proceeding is anchored in two (2) of the jurisdictional bases stated

in 28 U.S.C. §1334(b) for the exercise of bankruptcy jurisdiction.  "[C]ore proceedings consist of

two subsets: those that 'arise under' and those that 'arise in' the bankruptcy case."  <u>Porter</u>, 295

B.R. at 535.  At bottom, "[c]ore proceedings represent those disputes that are so intertwined with

the bankruptcy process that Congress has the power, under Article I of the Constitution, to direct

a non-tenured judicial officer (i.e., bankruptcy judge) to render a final determination of their

merits.  Id.

The Court of Appeals has provided guidance for the determination whether a claim is

core or non-core.

> If the proceeding involves a right created by the federal bankruptcy law, it is a
> core proceeding; for example, an action by the trustee to avoid a preference. If the
> proceeding is one that would arise only in bankruptcy, it is also a core proceeding;
> for example, the filing of a proof of claim or an objection to the discharge of a
> particular debt. If the proceeding does not invoke a substantive right created by
> the federal bankruptcy law and is one that could exist outside of bankruptcy it is
> not a core proceeding; it may be related to the bankruptcy because of its potential
> effect, but under section 157(c)(1) it is an "otherwise related" or non-core
> proceeding.

In re Guild and Gallery Plus, Inc., 72 F.3d 1171, 1178 (3d Cir. 1996) (quoting In re Wood, 825

F.2d 90, 97 (5th Cir. 1987)); accord In re Exide Technologies, 544 F.3d 196, 206 (3d Cir. 2008);

Halper, 164 F.3d at 836.  Of course, as part of the process of applying these principles, the

bankruptcy court must consult the illustrative examples of core proceedings set forth in 28

U.S.C. §157(b).  See Exide Technologies, 544 F.3d at 206.

No extended discussion is necessary to explain why the Trustee's first three (3) claims are

non-core.  These claims – (a) in contract, for breach of the implied duty of good faith and fair

dealing, (b) for breach of contract, and (c) for violation of 6 Del. C. §4A-305) – are not found in

28 U.S.C. §157(b)(2) or title 11 of the U.S. Code.  They all are grounded in applicable non-

bankruptcy law and exist independently of any bankruptcy filing.

The remaining two (2) claims subject to dismissal (Counts Six and Seven) are fraudulent

transfer claims.  Congress has classified such claims as core proceedings.  See 28 U.S.C.

§157(b)(2)(H).  However, it also is necessary to evaluate whether they are Stern claims.

The reported opinions discussing whether a bankruptcy court has the constitutional authority to enter a final judgment in a fraudulent transfer action brought pursuant to 11 U.S.C. §544 or 548 are legion.  See Construction and Application of United States Supreme Court Decision in Stern v. Marshall, 77 A.L.R. Fed. 2d 23, §§23-24 (West 2015).  I will not burden this Opinion with a lengthy analysis of the issue.  Suffice it to say that I agree with the court's reasoning in In re Int'l Auction & Appraisal Servs. LLC, 493 B.R. 460, 464-65 (Bankr. M.D. Pa. 2013).  In Int'l Auction, the court held that the Supreme Court's rationale in Stern, when combined with the Court's prior holding that the right to recover fraudulent transfers is a "private right," not a "public right," see Granfinanciera, S.A. v. Nordberg, 492 U.S. 33 (1989), compels the conclusion that the bankruptcy court lacks the authority to enter a final judgment in such matters.

In this bankruptcy case, where WSFS has not filed a proof of claim, and therefore resolution of the Trustee's fraudulent transfer claims can have no impact on the court's core function of allowing and disallowing claims against the bankruptcy estate, see Stern, 131 S. Ct. at 2616-17, this court lacks the authority to enter a final order with respect to those claims.[51]

### C.  The Limited Nature of this Court's Order Resolving the Cross-Motions

Having determined that WSFS' summary judgment motion should be granted, but that the bankruptcy court may not enter a final order dismissing Counts One, Two, Three, Six and Seven, what is the appropriate disposition of WSFS' motion?

---

[51]     The deadline for filing claims has expired.  (See Order dated March 10, 2010; Bky. No. 09-15404, Doc. # 297).

The issue is complicated by the fact that one (1) claim – Count Eight (11 U.S.C. §553) – has survived summary judgment. Had I concluded that WSFS was entitled to summary judgment on all of the Trustee's claims, I simply could have issued a report and recommendation to the district court for appropriate disposition of all of the Trustee's claims. However, because the district court referred this adversary proceeding to this court and the proceeding has not concluded, it would be premature for the bankruptcy court to issue a report and recommendation to the district recommending dismissal of some, but not all, of the Trustee's claims. Doing so would be the functional equivalent of permitting an interlocutory appeal of an order dismissing some, but not all, of a plaintiff's claims, in a proceeding in which the bankruptcy court has the authority to enter a final judgment. By analogy, that would run afoul of the strong policy against piecemeal appeals. See generally In re G-I Holdings, Inc., 2005 WL 3370020, at *5 (D.N.J. Dec. 9, 2005); see also Gold v. Johns-Manville Sales Corp., 723 F.2d 1068, 1072 (3d Cir. 1983) (discussing sparing use of collateral order doctrine).

My solution to the problem is to issue an order that dismisses the Trustee's claims (save Count Eight) **for purposes of trial of this adversary proceeding in the bankruptcy court**. At the conclusion of the adversary proceeding in this court, I will issue a comprehensive Report and Recommendation to the district court for the entry of an appropriate order with respect to all of those claims in the proceeding as to which the bankruptcy court lacks authority to enter a final judgment. See In re Drauschak, 481 B.R. 330, 339 (Bankr. E.D. Pa. 2012) ("when an adversary proceeding raises multiple claims, the various claims must be analyzed for bankruptcy

jurisdictional purposes on a claim-by-claim basis" (citing <u>Halper</u>, 164 F.3d at 839)).[52]

# X.  CONCLUSION

For the reasons set forth above, I will deny the Trustee's motion for summary judgment and grant WSFS' motion for summary judgment in part by dismissing for purposes of trial in the bankruptcy court Counts One, Two, Three, Six and Seven.  Count Eight survives summary judgment and will proceed toward trial.

An appropriate order follows.

Date: <u>November 24, 2015</u>

ERIC L. FRANK
CHIEF U.S. BANKRUPTCY JUDGE

---

[52]    Previously, I entered an interlocutory order, dismissing certain counts of the Trustee's Amended Complaint that, similarly were either non-core or core claims as to which the bankruptcy court lacks constitutional authority to enter a final judgment, absent consent of the parties.  (<u>See</u> Order dated June 14, 2012; Adv. No. 11-512, Doc. # 43).  Specifically, that Order dismissed the Trustee's Count Four (breach of fiduciary duty) and Count Nine (11 U.S.C. §547 preference) claims.  The Trustee did not re-plead those claims in his Second Amended Complaint.

The June 14, 2012 order's dismissal of Counts Four and Nine also was <u>for purposes of trial in the bankruptcy court</u>, not the entry of a final order or judgment of dismissal.  Consequently, the comprehensive Report and Recommendation that I will transmit to the bankruptcy court at the conclusion of this adversary proceeding also will recommend that the district court enter an appropriate order with respect to those claims.